**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NORTH DAKOTA
NORTHWESTERN DIVISION**

| | |
|---|---|
| Frankie and Kristin Kartch, )<br>)<br>Plaintiffs, )<br>)<br>vs. )<br>)<br>EOG Resources, Inc., )<br>)<br>Defendant. ) | **ODER DENYING MOTION TO<br>TO STRIKE JURY DEMAND**<br><br>Case No. 4:10-cv-014 |

_____

Before the court is defendant EOG Resources, Inc.'s ("EOG's") Motion to Strike Jury Demand. For the reasons set forth below, the motion is denied.

**I.   BACKGROUND**

    **A.   Procedural background**

Plaintiffs purchased a section of land located in Mountrail County, North Dakota. The sellers, however, retained the mineral rights, which they leased to a company which, in turn, assigned its lease to EOG. Sometime thereafter, EOG entered onto plaintiffs' surface estate and began drilling for oil.

Pursuant to the requirements of North Dakota's law protecting surface owners codified at N.D.C.C. ch. 38-11.1, EOG offered plaintiffs $8,000 for its use of their surface estate and for any compensable damages that might be caused by its drilling operations. Plaintiffs rejected the offer and instituted this action seeking damage relief under ch. 38-11.1. Initially, the action was filed in state court, but it eventually was removed to this court based upon a claim of diversity jurisdiction.

Thereafter, plaintiffs moved to amend their complaint to, among other things, add a claim for nuisance as well as claims alleging several federal and state constitutional violations, including a

1

"takings" claim. EOG opposed the motion. Notably, one of its arguments against the "takings" claim was that ch. 38-11.1 did not provide for a "taking" of plaintiffs' surface estate, much less a governmental taking.

The court denied plaintiffs' request for leave to add the proposed constitutional claims. However, the court did grant leave to add a nuisance claim.

EOG filed the present motion to strike plaintiffs' jury demand while the motion to amend the complaint was pending. Consequently, the parties have only addressed the right to a jury trial in the context of the statutory claims made pursuant to ch. 38-11.1 as set forth in the original complaint. However, since the court intends to deny the motion to strike for the reasons stated below, there is no need to require additional briefing to address the right to a jury trial for a claim of nuisance, which, based on the discussion that follows, likely will not be contested if plaintiffs seek damage relief.

**B.      Plaintiffs' statutory claims pursuant to ch. 38-11.1**

Before addressing the issue of whether plaintiffs are entitled to a jury trial with respect to their claims under ch. 38-11.1, some background regarding the chapter and the common law rights of the parties is helpful.

North Dakota's courts have long held that a severed mineral estate is dominant over the surface estate and carries with it an implied servitude for access and use of so much of the surface estate as is reasonably necessary for the development of the mineral estate. Hunt Oil Co. v. Kerbaugh, 283 N.W.2d 131, 135 (N.D. 1979) ("[T]he surface estate is servient in the sense it is charged with the servitude for those essential rights of the mineral estate."); see Christina v. Emineth, 212 N.W.2d 543, 550 (N.D. 1973); see also Feland v. Placid Oil Co., 171 N.W.2d 829, 834 (N.D. 1969) ("Whether the express uses are set out or not, the mere granting of the lease creates and vests

2

in the lessee the dominant estate in the surface of the land for the purposes of the lease; by implication it grants the lessee the use of the surface to the extent necessary to a full enjoyment of the grant.").

Prior to the adoption of ch. 38-11.1, there was a widespread belief that a severed mineral interest owner not only had the right to access and use the surface estate over the objection of the surface owner, but also did not have to provide compensation (absent an obligation to do so in the conveyancing documents, *e.g.*, payment for crop damage) so long as the access and use were reasonably necessary for the development of the minerals.  In other words, the rights of the surface owner were perceived as being limited to seeking relief in tort if the mineral owners use of the surface was unreasonable or negligent.  See, e.g., Murphy v. Amoco Production Co., 729 F.2d 552, 554-556 & n.3 (8th Cir. 1984) (upholding the constitutionality of ch. 38-11.1 and discussing the common law principles at the time of its adoption); Hunt Oil Co. v. Kerbaugh, 283 N.W.2d at 135 & n.4 (discussing the generally accepted view that a surface owner has no claim for damages for the reasonable use of the surface estate by the owners of the severed mineral estate or their lessees, but questioning the social desirability of such a rule and leaving open the issue of whether surface owners are entitled to compensation); Ronald W. Polston, Surface Rights of Mineral Owners- What Happens when Judges Make Laws and Nobody Listens?, 63 N.D. L. Rev. 41, 42 (1987) ("Under the traditional rule, the mineral owner has no obligation to pay the surface owner for the reasonable amount of surface consumed in the development of the mineral estate."); William P. Pearce, Surface Damages and the Oil and Gas Operator in North Dakota, 58 N.D. L. Rev. 458, 474 (1982) ("The fact that the lessee has a legally protected right to such surface use means that his acts will not expose him to liability for damages.").

Because of the perceived inequities in the relationship between the holders of the severed mineral interests and surface owners, the State Legislature passed in 1979 the "Oil and Gas Production Damage Compensation" law, codified at N.D.C.C. ch. 38-11.1, to provide greater protection to surface owners.  Among other things, ch. 38-11.1 provides surface owners with the following rights and statutory claims:

- Section 38-11.1-05 requires that mineral developers provide notice to surface owners before commencement of their operations, including a written advice of rights and a plan of intended operations.  If the requisite notice is not given, the surface owner can seek "appropriate" relief,  including actual and punitive damages.

- Section 38-11.1-04 requires that mineral developers compensate surface owners for the use and damage to the surface estate - even if the use or damage is reasonably necessary for the development of the mineral interests. Initially, the law commits the determination of the amount to be paid to negotiation between the parties with the mineral developer being required by § 38-11.1-08 to make an offer.  If negotiations are unsuccessful, the surface owner can then sue under § 38-11.1-09 to recover the compensation owed under § 38-11.1-04 and can also recover costs, interest, and reasonable attorney's fees if the amount recovered exceeds that which was offered by the mineral developer.

- Section 38-11.1-06 provides surface owners with a claim for relief in the event of a disruption or diminishment in quality or quantity of either their surface or underground water supplies caused by the mineral developer's operations. The section authorizes the recovery of damages, including specifically the recovery of any costs

incurred for the repair, alteration, or construction of water facilities required to ameliorate the disruption or diminishment of the water supplies. Section 38-11.1-06 further provides that the mineral developers are responsible for all damages to person or property resulting from their lack of ordinary care or from a nuisance created by the drilling operations.[1]

In this case, plaintiffs' complaint seeks (1) compensation for the use and damage to their surface estate; (2) compensation for an alleged inadequate notice, and (3) costs, interest, and attorney's fees if the amount recovered exceeds the $8,000 offered by EOG. In addition, the court has granted leave to amend the complaint to add a claim of nuisance. While an amended complaint has yet to be filed, the proposed amended complaint that was tendered to the court in connection with the motion to amend seeks injunctive relief requiring EOG to remove a waste disposal pit or, in the alternative, damages for the costs to remove the pit, and injunctive relief and damages for what plaintiffs' claim are excessive noise and emissions resulting from EOG's operations.

## II. DISCUSSION

### A. Federal law governs the right to a jury trial in diversity actions even when only enforcement of state-created rights is sought

The right to a jury trial in federal civil cases court is determined by federal law - even in diversity actions where the court is enforcing state-created rights. E.g., Simler v. Conner, 372 U.S. 221, 222 (1963) (per curiam); Gipson v. KAS Snacktime Co., 83 F.3d 225, 230-231 (8th Cir. 1996); see generally 9 Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 2303 (3d

---

[1] However, it is not entirely clear whether this language creates new statutory claims or simply makes clear that the statute does not foreclose the exercise of the common law claims of negligence and nuisance. Further, it may also not be entirely clear whether this language applies only to the protection of surface and grounds waters or whether it has more general applicability.

ed. 2008) ("Federal Practice & Procedure").  Moreover, where there is a right to a jury trial under federal law, this trumps any state law that would preclude a jury trial if the case was heard in state court.  Id.; see also Byrd v. Blue Ridge Rural Elec. Co-op., Inc., 356 U.S. 525, 538-539 (1958); Herron v. Southern Pac. Co., 283 U.S. 91 (1931).[2]

The right to a jury trial in federal civil cases is governed initially by the Seventh Amendment. Fed. R. Civ. P. 38(a).  In relevant part, the Seventh Amendment provides that, "[i]n Suits at common

---

[2] EOG argues that state law requires that actions pursuant to ch. 38-11.1 be tried only to the judge given the references to the term "court" in § 38-11.1-09.  Even if EOG is correct, the authority cited above makes clear this is not a consideration when the case is heard in federal court.  Further, the North Dakota Supreme Court has not yet spoken on the subject, and there are a number of reasons why it may reject EOG's argument.

First, the statutory use of the term "court" may not be dispositive since it can have a broader meaning that includes both the judge and jury.  See, e.g. Feltner v. Columbia Pictures Television, Inc., 523 U.S. 340, 356 (1998) ("Feltner") (Scalia, J., concurring) (citing supporting authority including dictionary definitions).  For example, the Supreme Court has reached different conclusions depending upon the context in which the term "court" is used in the statute.  Compare Feltner, 523 U.S. at 345-347 (concluding that the term "court" as used in the statute was intended to mean judge) with Lorillard v. Pons, 434 U.S. 575 (1978) (construing the ADEA, which, among other things, authorizes "the court . . . to grant such legal or equitable relief as may be appropriate," to be read as affording a right to a jury trial on claims for backpay based on an examination of all of the relevant language of the statute).  Here, there is an argument that the broader meaning of the term was intended given its generic use in § 38-11.1-09 and the fact there are not similar references in the other sections of ch. 38-11.1 that create claims for relief which are in addition to those that are the subject of § 38-11.1-09.

Second, the North Dakota Supreme Court in Moses v. Burleigh County, 438 N.W.2d 186, 193-194 (1989) ("Moses") concluded there was a right to a jury trial for legal claims brought pursuant to the North Dakota Human Rights Act despite the use of the term "court" in § 14-02.4-20, which is not unlike the use of the term in § 38-11.1-09.

Third, the North Dakota Constitution, Art. I, § 13 preserves the right to a jury trial as it existed at common law. E.g., Dorgan v. Kouba, 274 N.W.2d 167, 169 (1978).  Further, the North Dakota Supreme Court has made clear that "[m]oney damages are traditionally legal relief triable by a jury." Moses, 438 N.W.2d at 194.  Based on this, the North Dakota Supreme Court might conclude that the state constitutional right to a jury trumps anything to the contrary in § 38-11.1-09, similar to what the United States Supreme Court concluded in Feltner, supra, where the Court held there was a right to a jury trial under the Seventh Amendment with respect to the statutory claim despite the language of the statute which the court construed as providing for a determination by the judge.  Also, the North Dakota Supreme Court could apply the broader construction of the term "court" to include both the judge and jury in order to avoid a constitutional conflict.  Gregory v. North Dakota Workers Compensation Bureau, 1998 ND 94, ¶ 578 N.W.2d 101 ("If a statute is open to divergent constructions, one that would make it of doubtful constitutionality and one that would not, this court must adopt the construction that avoids a constitutional conflict.").  In fact, one of these possibilities may have been the basis for the North Dakota Supreme Court's decision in Moses.  In that case, there was a dissent which argued that the statutory reference to the "court" meant that the Legislature had intended that there not be a jury trial.  Moses, 438 N.W.2d at 196. Without addressing either the dissent's argument or the statutory use of the term "court," the majority referenced the state constitutional right to a jury, stated that the issues to be determined were legal, and concluded that there was a right to a jury trial.  Id. at 193-194.

law, where the value in controversy shall exceed twenty dollars, the right of trial by jury shall be preserved . . . ."

### B. The two-step inquiry mandated by more recent Supreme Court decisions

Consistent with the language of the Seventh Amendment "preserving" the right to a jury trial in "[s]uits at common law," the more recent decisions of the Supreme Court have held that the determination of whether there is a right to jury trial requires a two-step inquiry. E.g., City of Monterey v. Del Monte Dunes at Monterey, Ltd, 526 U.S. 687, 708-709 (1999) ("City of Monterey"); Tull v. United States, 481 U.S. 412, 417-418 (1987); see generally 9 Federal Practice and Procedure § 2302.2

The first step is to determine whether the action was tried "at law" when the country was founded or is analogous to one that was. In most cases, this, in turn, requires an analysis of whether the particular action, or an analogous one, was customarily brought in the English law courts, where a jury trial was customary, as opposed to the English courts of equity or admiralty, where juries were not used. Id. If the action falls into the "law category," the second inquiry is to determine what issues are proper for jury determination, which also requires a similar historical analysis to determine whether the particular issues, or analogous ones, were decided by the judge in suits at common law when the Seventh Amendment was adopted or whether they were decided by the jury. Id.

#### 1. The first-step inquiry

There is no dispute over the fact that the claims made available by N.D.C.C. ch. 38-11.1 were non-existent at the time of founding. Consequently, the issue for determination is whether there was an analogous claim heard during the late 18th century in the English law courts.

As discussed earlier, most of ch. 38-11.1's statutory claims provide compensation to surface owners for use and damage to their property arising out of the operations of the mineral developer. Given that the liability for these claims arises as a matter of law and that there are provisions for damages (which are measured by the harm suffered by the surface owner, as opposed to any gain of the mineral developer), these claims "sound in tort" or are "tort like." See, e.g., City of Monterey, 526 U.S. at 709-711 (concluding for similar reasons that an action pursuant to 42 U.S.C. § 1983 "sounds in tort"); Curtis v. Loether, 415 U.S. 189, 195 (1974) ("A damages action under the statute [Title VIII of the Civil Rights Act] sounds basically in tort - the statute merely defines a new legal duty, and authorizes the courts to compensate a plaintiff for the injury caused by the defendant's wrongful breach."); cf. Murphy v. Amoco Production Co., 729 F.2d at 555 n.3 (comparing the relief available under ch. 38-11.1 to strict liability in tort for purposes of concluding that the chapter was a valid exercise of the state's police power and not unconstitutional);[3] see generally, W. Keeton, Prosser and Keeton on The Law of Torts, §§ 1, 92 (5th Ed. 1984) (hereinafter "Prosser and Keeton on Torts") (discussing the attributes of a "tort" and stating in § 92 that "[t]ort obligations are in general obligations that are imposed by law on policy considerations to avoid some kind of loss to others.").

---

[3] In Murphy, the mineral developer argued, among other things, that the requirement in ch. 38-11.1 that surface owners be compensated for the mineral developer's reasonable use of the surface estate amounted to an unconstitutional "taking" of its common law property rights as well as an unconstitutional impairment of its right to contract. In rejecting these claims, the Eighth Circuit concluded, among other things, that it was well within the State of North Dakota's police power to make mineral developers responsible for paying compensation for all use and damage to the surface caused by the developer's operations, even that which is reasonably necessary for the development of the minerals. In so concluding, the court stated that one of the public benefits in imposing liability upon mineral developers, comparable to strict liability in tort, was the potential for lessening the incidence of tort claims by surface owners for unreasonable use of the surface, which was not protected by any common law rights acquired by the mineral developer. Murphy, 729 F.2d at 555 n.3.

More specifically, there are close analogies between the claims available under ch. 38-11.1 and the common law torts of trespass and nuisance in that both the statutory claims and the common law claims provide similar protection from undesirable interferences with property as well as comparable damage remedies.  See Prosser and Keeton on Torts §§13, 87; cf. City of Monterey, 526 U.S. at 715-716 (citing authority holding that actions seeking relief for inverse condemnation are comparable to the common torts of trespass and nuisance).  And, with respect to the required historical analysis, there were analogous claims heard in the English law courts at the time of founding, *i.e.,* actions for trespass, trespass on the case,  and trespass on the case for nuisance. E.g., City of Monterey, 526 U.S. at 716 (citing 3 W. Blackstone, Commentaries on the Laws of England) & 729 (Scalia, J. concurring, citing additional authority).

Notwithstanding the foregoing, EOG argues that eminent domain is the only appropriate analogy and, since there is no right under the Seventh Amendment to a jury trial in federal eminent domain actions, there should be no right to a jury trial for claims brought pursuant ch. 38-11.1.  This argument fails for several reasons.

First, the common law actions for trespass and nuisance provide suitable analogies and ones that are closer for the actual circumstances of this case than the eminent domain analogy proffered by EOG.  In substance, the common law claims of trespass and nuisance provide relief from unauthorized encroachments upon another's property.  While not a perfect fit for the circumstances of this case given the dominant rights of the mineral developer, EOG's eminent domain analogy is no closer in this respect.  It too assumes there has been an encroachment upon the property interests of the surface owner; otherwise, in continuing the analogy, there would be no need to determine the amount of "just compensation" to be paid the surface owner.

9

What makes EOG's analogy a poor fit for the circumstances of this case is that an eminent domain action is one undertaken by the government (or an entity that has been granted the government's power of eminent domain). And, here, as EOG correctly argued in opposition to plaintiffs' earlier motion to amend its complaint to add a "takings" claim, ch. 38-11.1 does not provide for any "taking" of the surface estate, whether by the state or by EOG as result of a grant of the state's power. Rather, as the court concluded in its earlier order, EOG acquired its right to enter and use the surface estate at common law. Consequently, the closer analogies for a private party encroaching upon the property interests of another are the common law actions for trespass and nuisance.

EOG's analogy to an eminent domain proceeding is also a poor one for another and even more fundamental reason. As the Supreme Court observed in City of Monterey, it had decided in earlier cases that there was no constitutional right to a jury trial in eminent domain actions because the use of juries in such actions at the time of founding was not clear. City of Monterey, 526 U.S. at 711. A good part of the reason for that had to do with the principles of sovereign immunity and the notion that any waiver of that immunity could be only upon the grounds that the sovereign authorized. City of Monterey, 526 U.S. at 738-739 (Souter, J., concurring in part and dissenting in part); cf. Kohl v. United States, 91 U.S. 367 (1875). In other words, if the sovereign authorized a non-jury alternative (*e.g.*, the use of commissioners) for deciding what compensation was due, then that would pass constitutional muster. See id. Here, however, there is no governmental "taking." Consequently, there is no principled justification for limiting a person's Seventh Amendment rights in an action against another private party by use of analogy that is bound up in considerations of sovereignty that are not applicable for the situation. Cf. City of Monterey, 526 U.S. at 711-713.

Notably, the Supreme Court in City of Monterey rejected the eminent domain analogy in a case that, arguably, was much closer in terms of its possible applicability than this one given that it actually involved a governmental "taking." In that case, the plaintiff property owner had sued the City of Monterey under 42 U.S.C. § 1983, claiming a regulatory "taking" in violation of the Fifth Amendment. The Justices split equally over whether there is a difference between a formal eminent domain proceeding initiated by the government, for which all agreed no jury trial is required by the Seventh Amendment, and an inverse condemnation, such that a jury trial should be permitted with respect to the latter, at least when brought pursuant to § 1983. The Dissenting Justices believed there to be no principled difference and concluded the plaintiff was not entitled to a jury trial. 526 U.S. at 734-749 (Souter, J., joined by O'Conner, Ginsburg, and Breyer, J.J., concurring in part and dissenting in part). The Plurality, however, believed that the analogy to a formal eminent domain proceeding was not appropriate, arguing, among other things, that there was historical evidence of actions sounding in tort being brought in this country in the late 18th century for the recovery of money when the government took property without paying compensation, including actions for trespass and nuisance, and that these were a better analogy and provided for a jury trial since there were analogous tort actions in the English law courts. Id. at 711-718 (Kennedy, J. joined by Rehnquist, Stevens, and Thomas, C.J. & J.J.) Justice Scalia, whose concurring opinion tipped the balance in terms of the ultimate holding that the plaintiff was entitled to a jury trial, thought the whole issue was irrelevant. He rejected the eminent domain analogy on the grounds that there was no need to look to the substance of the action because the court had already concluded for different purposes that a § 1983 suit was analogous to a tort action for which a jury would have been permitted in the

English law courts at the time of founding. Id. at 727-731 (Scalia, J. concurring in all but Part IV-A-2 of Kennedy, J.'s opinion).

In terms of this case, what is significant about City of Monterey is not only its holding, but also the fact that there is nothing in the opinion of the Dissenting Justices which would suggest that they would conclude that an eminent domain analogy would be appropriate in this case where no governmental "taking" is involved. Rather, their rationale for applying the law relating to formal eminent domain actions in that case was precisely because the subject of the inverse condemnation action was a governmental "taking."[4]

In summary, the first-step inquiry results in the conclusion that there were actions sufficiently analogous to the statutory claims available under ch. 38-11.1 that were heard in the English law courts at the time of founding. Further, EOG's proffered analogy, which would deny the right to a jury trial, is rejected.

### 2.     **Second-step inquiry**

At this point, the parties are still engaged in discovery. Also, it is likely that there will be one or more motions for summary judgment. As consequence, the issues to be resolved at trial have not

---

[4]  A breach of contract claim for damages is another possible analogy for the claims that is closer to the circumstances of this case than the eminent domain analogy proffered by EOG. Without going into a detailed historical analysis, it appears that breach of contract claims for damages are considered legal actions to which the right to a jury trial under the Seventh Amendment attaches. E.g., Ross v. Bernhard, 396 U.S. 531, 542-543 (1970); see generally 9 Federal Practice and Procedure § 2316 & n. 8. The argument here would be that the most of the obligations imposed by ch. 38-11.1 are similar to an implied-at-law condition that would attach to the common law servitude providing the mineral interest holder with the right of access and use of the surface and that would require that compensation be paid to the surface owner for any use or damage to the surface estate, see Hunt Oil Co. v. Kerbaugh, 283 N.W.2d at 135 n.4 (leaving open the possibility of the adoption of such a rule); 17A Am. Jur. 2d Contracts § 12 (1991), and that the suit for the enforcement of the condition would, in essence, be one for breach of contract, cf. Turnbull v. Car Wash Specialties, LLC, 272 S.W.3d 871, 873-875 (Mo. App. 2008).

been finally determined. For this reason, a final determination on what issues are proper subjects for the jury can be made later and the parties can revisit the issue in their trial briefs.

Generally speaking, however, issues of disputed fact relevant to the determination of liability on a legal claims in almost all instances must be resolved by the jury. E.g., City of Monterey, 526 U.S. at 720 ("In actions at law predominately factual issues are in most cases allocated to the jury."); Tull v. United States, 481 U.S. at 422-425 (concluding that the issue of liability for civil penalties under the Clean Water Act was to be determined by the jury). The same is true for the determination of the amount of damages, at least absent special considerations that are not applicable here. E.g., Feltner v. Columbia Pictures Television, Inc., 523 U.S. 340, 352-355 (1998); cf. Tull v. United States, 481 U.S. 425-427 (concluding that the determination of the amount of civil penalties to be paid under the Clean Water Act must be made by the judge because of the highly discretionary and numerous factors that must be considered which make it different from an assessment of damages).

Finally, if plaintiffs do amend their complaint to seek injunctive relief in addition to their claims for damages, they likely will not lose their right to a jury trial with respect to the damage claims. Unlike what might be the situation under state law, the Supreme Court has rejected the approaches of denying a right to a jury by characterizing the legal claims as incidental to the equitable claims or by concluding that the equitable are dominate. E.g., Tull v. United States, 481 U.S. at 424-425; Dairy Queen, Inc. v. Wood, 369 U.S. 469, 473 n.8 (1962) ("It would make no difference if the equitable cause clearly outweighed the legal cause so that the basic issue of the case taken as a whole is equitable. As long as any legal cause is involved the jury rights it creates control.") (quoting Thermo-Stitch, Inc. v. Chemi-Cord Processing Corp., 294 F.2d 486, 491 (5th Cir. 1961); see generally 9 Federal Practice and Procedure §§ 2302.1 & 2305-2306. Further, in all but

cases of "imperative circumstances," the Supreme Court has rejected the procedure of trying the equitable claims first with the court's determination then becoming binding as to any common issues shared with the legal claims and thereby foreclosing their submission to the jury. Dairy Queen, Inc. v. Wood, 369 U.S. at 470-473; see generally 9 Federal Practice and Procedure § 2301.1.

In summary, it appears likely there will be issues that must be tried to the jury for the statutory claims made pursuant to ch. 38-11.1.

### C. This court's prior treatment of claims pursuant to ch. 38-11.1

The conclusions reached above are consistent with this court's prior treatment of claims for damages under ch. 38-11.1. As cited earlier, the Eighth Circuit upheld the constitutionality of ch. 38-11.1 in Murphy v. Amoco Production Co., supra, which originated in this court. As the Eighth Circuit's opinion makes clear, this court submitted most of the matters at issue under ch. 38-11.1 to the jury, which returned a verdict in the amount of $5,643.49 for lost agricultural production and $4,967.00 for lost land value, with the court later tacking on an additional $8,162.70 in costs and attorney's fees. Murphy, 729 F.2d at 554. This case is not dipositive since there is no indication the issue of the plaintiff's right to a jury trial was contested. It is noteworthy nonetheless.

### III. ORDER

For the reasons set forth above, EOG's Motion to Strike Jury Demand (Docket No. 9) is **DENIED**.

**IT IS SO ORDERED.**

Dated this 22nd day of October, 2010.

*/s/ Charles S. Miller, Jr.*
Charles S. Miller, Jr.
United States Magistrate Judge