IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NORTH DAKOTA
NORTHWESTERN DIVISION

| Frankie and Kristin Kartch, | ) | |
|---|---|---|
| | ) | **ORDER GRANTING IN PART,** |
| Plaintiffs, | ) | **DEFERRING IN PART,** |
| | ) | **AND DENYING IN PART** |
| vs. | ) | **PLAINTIFFS' MOTION TO** |
| | ) | **COMPEL** |
| EOG Resources, Inc., | ) | |
| | ) | Case No. 4:10-cv-014 |
| Defendant. | ) | |

___

I. **BACKGROUND**

Plaintiffs are surface owners of land located in Mountrail County that includes parts of Sections 7 & 8 and all of Section 17 in T158N, R89W. Plaintiffs purchased Section 17 in 2004. The sellers, however, retained the mineral interests and subsequently entered into an oil and gas lease with a company based in Williston, North Dakota. This company, in turn, assigned its lease to defendant EOG Resources, Inc. ("EOG").

In 2008, EOG entered Section 17 and began drilling an oil well that was completed in 2009 and that is still producing today. After EOG had drilled the well, plaintiffs purchased the land in Sections 7 and 8, which is a 520-acre tract located north of and adjacent to Section 17 and upon which sits a rural residence that is approximately ½ mile from the well site in Section 17. The Section 17 property has been used only for agricultural or recreational purposes and has not been otherwise developed. Plaintiffs do not permanently reside on their Mountrail County property and live in Duluth, Minnesota.

1

N.D.C.C. ch. 38-11.1 requires mineral developers to provide a modicum of compensation to surface owners for damages caused by oil and gas production, thereby alleviating, at least to some degree, the harsh results flowing from the mineral estate being dominant, including the fact that the mineral developer at common law was likely not required to pay any compensation for use of the surface. Prior to commencement of drilling, EOG tendered an offer to pay the anticipated damages for use of the surface as required by ch. 38-11.1. The amount it offered was $8,000. Plaintiffs rejected the offer, contending it was inadequate, and instituted this action.

In their Second Amended Complaint, plaintiffs assert claims for compensation pursuant to ch. 38-11.1 for EOG's lawful use of their surface estate. In addition, they seek damages and injunctive relief for uses of the surface estate that they claim were improper, either because the uses exceeded EOG's property rights or because the uses created a nuisance or were negligent.

One of the primary items of disagreement between the parties relates to EOG's use of a "reserve pit" during drilling to hold drilling mud and deposit well cuttings - material that typically contains some environmentally-hazardous compounds, which, if allowed to escape, could cause pollution - particularly to nearby surface and ground waters. In constructing the reserve pit, EOG used a synthetic liner, but states this was simply a precautionary measure and not required because of the relatively impervious clay soils in which the pit was constructed. When drilling was completed, EOG removed the liquid waste from the pit, but left the well cuttings and other solid wastes in place as permitted by state regulations. EOG then covered the pit, leaving it and the waste contained therein buried slightly more than four feet below a recontoured surface.

Plaintiffs contend that EOG's use of a reserve pit was in excess of its property rights and amounted to a trespass. They also claim that use of the pit, and later leaving it in place filled with

2

waste, created a nuisance and was negligent. Plaintiffs argue that, instead of a reserve pit, EOG should have used an alternative, such as a "closed loop" system, which recycles part of the drilling mud and captures the remainder along with the well cuttings in tanks for later disposal offsite at permitted disposal locations.[1] Plaintiffs also contend that, at the very least, EOG should have completely reclaimed the reserve pit by excavating the wastes and the pit liner and trucking them to a permitted waste disposal area. Plaintiffs argue that leaving the drilling wastes buried on their property near the surface is unreasonable because it diminishes the value of their property, limits its future use, creates a risk of damage if there is a future leakage or leaching of toxic chemicals from the buried wastes, and exposes them to the possibility of financial responsibility for any cleanup if EOG is not around to answer for the consequences because it has gone bankrupt or is otherwise out of business.

In addition to contending that EOG's use of the reserve pit was *per se* unreasonable, plaintiffs also contend that the pit and wastes should have been completely removed in this case because a tear was discovered in the liner while the pit was still open. EOG acknowledges there was a tear, but claims there is no evidence that any material actually leaked from the pit. EOG states that it removed soil from either side of the tear and trucked it out as a precautionary measure when it covered the pit. EOG states this was done under state regulatory supervision and that there is no reason to believe now that the dry wastes remaining in the pit pose any significant risk of future environmental harm - at least so long as they remain undisturbed.

---

[1] The "closed loop" system contemplated here is one that does away with the use of a reserve pit altogether. There are also "semi-closed loop" systems that use portable tanks to handle the drilling fluids but still use a pit for handling the well cuttings.

3

Another primary area of disagreement between the parties is the amount of damages that plaintiffs are entitled to receive as result of EOG's use of plaintiffs' surface estate. EOG claims that the $8,000 it offered is significantly in excess of what is recoverable as a matter of law. Plaintiffs disagree and claim that the recoverable damages exceed that amount.

## II. DISCUSSION

### A. Introduction

Now before the court is plaintiffs' motion to compel discovery. Plaintiffs claim that part of the discovery they seek is relevant to the reserve pit issues and the remainder to the amount of compensation that they are entitled to receive for the use of their surface estate. EOG disagrees, contending that the information being sought is irrelevant and that the discovery requests are unduly burdensome.

Also before the court is the question of the timing of the disputed discovery. EOG has filed a motion for summary judgment that it contends should be ruled on before the court allows any of the disputed discovery. EOG claims a ruling in its favor, particularly on the issue of whether the use of the reserve pit was within its property rights, would alleviate the need for most, if not all, of the disputed discovery. Plaintiffs disagree. They contend that EOG is not entitled to judgment as a matter of law and that they need the disputed discovery to be able to properly respond to EOG's motion. Until these matters could be sorted out, the court temporarily extended plaintiffs' time to respond to the summary judgment motion.

B. **The discovery that plaintiffs claim is necessary to demonstrate that EOG's use of a reserve pit was in excess of its property rights, negligent, and/or a nuisance**

EOG contends that the fact that state regulations allow use of reserve pits as a general matter is dispostive in terms of its right to use a reserve pit here. EOG also contends that, as the lessee of an oil and gas lease from the owner of the dominant mineral estate, it has the right to use the plaintiffs' surface estate for any reasonable purpose in support of the exercise of its rights and that a reserve pit is a reasonable use both as a matter of law and undisputed fact. According to EOG, any discovery regarding whether the use of a reserve pit was reasonable under the circumstances is simply irrelevant.

In many cases, the staggering of discovery to allow one party to litigate issues piecemeal is inefficient and simply adds to the time required to resolve the case. However, there are times when resolving some issues in advance will conserve party or court resources and makes sense. To determine whether this is such a case, an assessment of whether the issues claimed by EOG as being dispositive are *realistically* capable of being resolved by summary judgment without first affording plaintiffs the discovery they claim they need, as well as whether resolving these issues first is likely to conserve party or judicial resources, is appropriate. However, before considering these points, some discussion of North Dakota law regarding the relative rights of the mineral estate versus the surface estate, as well as the state regulations governing the use of reserve pits, is helpful.

Under North Dakota law, a severed mineral interest is dominant and carries with it the "inherent surface rights to find and develop the minerals." Hunt Oil Co. v. Kerbaugh, 283 N.W.2d 131, 135 (N.D. 1979) ("Hunt Oil") ("[T]he surface estate is servient in the sense it is charged with the servitude for those essential rights of the mineral estate."); see Christina v. Emineth, 212 N.W.2d 543, 550 (N.D. 1973); see also Slaaten v. Cliff's Drilling Co., 748 F.2d 1275, 1278 (8th Cir. 1984)

(observing that North Dakota's position is in accord with the general rule in the oil and gas industry). "Without such rights the mineral estate would be meaningless and worthless." Hunt Oil, 283 N.W.2d at 135.[2]

While the severed mineral estate is dominant, the North Dakota Supreme Court has made clear that there are limits on the right of the mineral estate to use the surface estate for oil and gas development. The controlling case is Hunt Oil, supra. In that case, the North Dakota Supreme Court discussed these limits at some length and also what is commonly referred to as the "accommodation doctrine" - or at least one version of it. And, because both parties are relying on the court's language in that case, it is best to simply quote from it at length:

> In the absence of other rights expressly granted or reserved, the rights of the owner of the mineral estate are limited to so much of the surface and such use thereof as are Reasonably necessary to explore, develop, and transport the minerals. See, Union Producing Co. v. Pittman, 245 Miss. 427, 146 So.2d 553 (1962); 58 C.J.S. Mines and Minerals s 159c; Annot., 53 A.L.R.3d 16 s 3(a). In addition to, or underlying the question of what constitutes reasonable use of the surface in the development of oil and gas rights, is the concept that the owner of the mineral estate must have Due regard for the rights of the surface owner and is required to exercise that degree of care and use which is a just consideration for the rights of the surface owner. Getty Oil Co. v. Jones, 470 S.W.2d 618, 621, 53 A.L.R.3d 1 (Tex.1971). Union Producing Co. v. Pittman, supra; 58 C.J.S. Mines and Minerals s 159c; Annot., 59 A.L.R.3d 16 s 3(c). Therefore, the mineral estate owner has no right to use more

---

[2] In this case, EOG acquired its right to develop the oil and gas underlying plaintiffs' property by way of a lease from the owner of the severed mineral estate. Notably, EOG's lease is not specific in terms of the right of EOG to use waste pits, and, perhaps more importantly in this case, the right to leave the drilling wastes on the property buried a few feet below the surface after drilling is completed. The relevant language of the lease states the following:
> . . . the exclusive right for the purpose of mining, exploring by geophysical and other methods, and operating for and producing therefrom oil and all gas of whatsoever nature or kind, with rights of way and easements for laying pipe lines and erection of structures thereon to produce, save and take of said products, all that certain tract of land . . . .

(Doc. No. 13-2). While this language by itself might create an issue as to the scope of the rights acquired by EOG, North Dakota law governing oil and gas leases is that the absence of specific language in the lease is not fatal with respect to a particular use of the surface estate. That is, "[w]hether the express uses are set out or not, the mere granting of the lease creates and vests in the lessee the dominant estate in the surface of the land for the purposes of the lease; by implication it grants the lessee the use of the surface to the extent necessary to a full enjoyment of the grant." Hunt Oil, 283 N.W.2d at 135; see also Feland v. Placid Oil Co., 171 N.W.2d 829, 834 (N.D. 1969).

6

of, or do more to, the surface estate than is reasonably necessary to explore, develop, and transport the minerals. Union Producing Co. v. Pittman, supra; 58 C.J.S. Mines and Minerals s 159c. Nor does the mineral estate owner have the right to negligently or wantonly use the surface owner's estate.[4] See, Union Producing Co. v. Pittman, supra; 4 Summers, Oil and Gas, s 652.

The requirement that due regard be given to the rights of the surface owner, defines, to a certain extent, a consideration in determining if the mineral owner's use of the surface is reasonably necessary. In Getty Oil Co. v. Jones, supra, the Texas Supreme Court set forth what has become known as the "accommodation doctrine":

> "There may be only one manner of use of the surface whereby the minerals can be produced. The lessee has the right to pursue this use, regardless of surface damage. (Citations omitted.) And there may be necessitous temporary use governed by the same principle. But under the circumstances indicated here; i. e., where there is an existing use by the surface owner which would otherwise be precluded or impaired, and where under the established practices in the industry there are alternatives available to the lessee whereby the minerals can be recovered, the rules of reasonable usage of the surface may require the adoption of an alternative by the lessee." 470 S.W.2d at 622.

The Utah Supreme Court adopted the opinion of the Texas court in Flying Diamond Corporation v. Rust, 551 P.2d 509 (Utah 1976), where it said, at page 511:

> ". . . wherever there exist separate ownerships of interests in the same land, each should have the right to the use and enjoyment of his interest in the property to the highest degree possible not inconsistent with the rights of the other. We do not mean to be understood as saying that such a lessee must use any possible alternative. But he is obliged to pursue one which is reasonable and practical under the circumstances."

We join with the Utah court in adopting the accommodation doctrine set forth in Getty:

> "The reasonableness of a surface use by the lessee is to be determined by a consideration of the circumstances of both and, as stated, the surface owner is under the burden of establishing the unreasonableness of the lessee's surface use in this light. The reasonableness of the method and manner of using the dominant mineral estate may be measured by what are usual, customary and reasonable practices in the industry under like circumstances of time, place and servient estate uses. What may be a reasonable use of the surface by the mineral lessee on a bald prairie used only for grazing by the servient surface owner could be unreasonable within an existing residential area of the City of Houston, or on the campus of the University of Texas, or in the middle of an irrigated farm. What we have said is that in determining the issue of whether a particular manner of use in the dominant estate is reasonable or unreasonable, we cannot ignore the condition of the surface itself and the uses then being made by the servient surface owner. . . . (I)f the manner of use selected by the dominant mineral lessee is the only reasonable, usual and customary method that is available for developing and producing

7

the minerals on the particular land then the owner of the servient estate must yield. However, if there are other usual, customary and reasonable methods practiced in the industry on similar lands put to similar uses which would not interfere with the existing uses being made by the servient surface owner, it could be unreasonable for the lessee to employ an interfering method or manner of use. These (conditions) involve questions to be resolved by the trier of the facts." 470 S.W.2d at 627-628.

In this case the Kerbaughs sought to prevent the oil companies from conducting seismic exploration activities on their property. The oil companies, on the other hand, sought an injunction prohibiting the Kerbaughs from interfering with such exploration.

The Kerbaughs, in support of their argument for denial of injunctive relief, offered affidavits and testimony indicating the damages they had sustained as the result of prior seismic exploration; that the present seismic activity was causing damage to their grain crop, pasture, and other farmland; and that they fear additional damage to property from further seismic activity.

Whether or not the use of the surface estate by the mineral estate owner is reasonably necessary is a question of fact for the trier of facts. Slope County Board of County Commissioners v. Consolidation Coal Co., 277 N.W.2d 124 (N.D.1979); Getty Oil Co. v. Jones, supra. In addition, the burden of proof in such a determination is upon the servient estate owner. Getty Oil Co. v. Jones, supra.

The Kerbaughs presented evidence establishing the damage to their property that arose or was likely to arise as a result of seismic activity. They offered, however, no evidence of reasonable alternatives available to the oil companies to explore the properties. They offered no evidence that the same information could be obtained from the prior geophysical exploration; they offered no evidence that the same information could be obtained without transversing over cropland; and the record does not indicate that they offered evidence that the tests could be conducted in another manner which would cause less damage to the Kerbaughs. Although the Kerbaughs did offer evidence suggesting some damage could have been avoided by having the oil companies conduct the operations a few weeks later, the affidavits filed by the oil companies indicate this was not a reasonable alternative. On the basis of the evidence presented by the parties, the Kerbaughs failed to meet their burden of proof that the proposed activities of the oil companies were not reasonably necessary for the exploration of the leased mineral estate. Accordingly, the conclusion by the district court that the oil companies were entitled to injunctive relief was not in error.

It is important to note that the Texas Supreme Court in Getty concluded the accommodation doctrine is not a balancing type test weighing the harm or inconvenience to the owner of one type of interest against the benefit to the other. Rather the court said the test is the availability of alternative non-conflicting uses of the two types of owners. Inconvenience to the surface owner is not the controlling element where no reasonable alternatives are available to the mineral owner or lessee. The surface owner must show that under the circumstances, the use of the surface under attack is not reasonably necessary. Getty Oil Co. v. Jones, supra at 623.

> We agree a pure balancing test is not involved under the accommodation doctrine where no reasonable alternatives are available. Where alternatives do exist, however, the concepts of due regard and reasonable necessity do require a weighing of the different alternatives against the inconveniences to the surface owner. Therefore, once alternatives are shown to exist a balancing of the mineral and surface owner's interest does occur.
>
> Kerbaugh argued and urged this court to adopt a rule of correlative rights and reasonableness, as discussed in Pennington v. Colonial Pipeline Company, 260 F.Supp. 643, 25 Oil and Gas Rptr. 514 (E.D.La.1966) affirmed 5 Cir., 387 F.2d 903. In that case the district court said the rights of the holder of a mineral lease, and the rights of the owner of the surface "are correlative rights, neither being superior to nor inferior to the other, and the rights of each party can only be exercised in such a manner as not to unreasonably interfere with the rights of the other. (Citations omitted.)" Be that as it may, it does not change the basic rule that a servitude exists in favor of the oil and gas estate and thus it is the dominant estate and the surface the servient estate. Although the rights implied in favor of the mineral estate can be exercised only by giving due regard to the rights of the surface owner, the mineral estate still remains dominant in the traditional real property sense. The district court in Pennington, although applying the right test of reasonableness, made an unfortunate use of the term "correlative rights" which is more appropriately used in referring to rights among various owners of mineral interests. See, Arnstad v. North Dakota State Industrial Commission, 122 N.W.2d 857 (N.D.1963); 1 Kuntz, Oil and Gas s 43.
>
> \* \* \* \*
>
> The oil companies were not required to show their proposed activities were the most reasonable or even that other alternatives were unreasonable in the absence of the Kerbaughs' bringing the reasonableness of other alternatives into issue. The oil companies had the right to use the surface in exploring for their minerals. They also had the right to seek an injunction preventing the Kerbaughs from interfering with the right of exploration. It was the Kerbaughs' burden to show the proposed activities were unreasonable by reason of the existence of other alternatives.

Hunt Oil, 283 N.W.2d at 136-139.

Also relevant to the reserve pit dispute is the fact that the Industrial Commission, which is the state agency charged with regulating the development of oil and gas in North Dakota, has for decades permitted the use of reserve pits. (Doc. No. 47-3). At the time of the drilling in this case, the most pertinent regulation read, in relevant part, as follows:

> In order to assure a supply of proper material or mud-laden fluid to confine oil, gas, or water to its native strata during the drilling of any well, each operator shall

9

provide, before drilling is commenced, a container or reserve pit of sufficient size to contain said material or fluid, and the accumulation of drill cuttings. A reserve pit may be utilized to contain solids and fluids used and generated during well drilling and completion operations, providing the pit can be constructed, used, and reclaimed in a manner that will prevent pollution of the land and surface and freshwaters. In special circumstances, the director may prohibit the construction of a reserve pit or may impose more stringent pit construction and reclamation requirements. Under no circumstances shall reserve pits be used for disposal, dumping, or storage of fluids, wastes, and debris other than drill cuttings and fluids used or recovered while drilling and completing the well.

Reserve pits shall not be located in, or hazardously near, bodies of water, nor shall they block natural drainages. No reserve pit shall be wholly or partially constructed in fill dirt unless approved by the director.

N.D. Admin. Code § 43-02-03-19 (2008).

EOG makes several arguments why there is no issue of reasonableness to be tried with respect to its use of a reserve pit. Some appear to be more compelling than others. However, the arguments for which there is substantial authority include one or more of the following:

(1) Since it is undisputed that use of reserve pits is an established industry practice and that the Industrial Commission has long permitted their use, albeit subject to restrictions that have been tightened over time, it cannot reasonably be disputed that reserve pits are a reasonable use of the surface by the dominant mineral estate within the meaning of Hunt Oil.

(2) Even if plaintiffs could prove that one of the alternatives available to EOG would be equally or more reasonable after a balancing of the direct and indirect benefits and costs for both parties (including eliminating the risk of future reserve pit leaks and the possibility of someone having to incur future environmental cleanup costs and regulatory fines), it would not make a difference. This is because one way to read Hunt Oil, as well as other authority that the court might find persuasive, is that, so

10

long as EOG's use of a reserve pit was reasonable, the fact that there may have been another even more reasonable alternative is not by itself enough. Rather, plaintiffs must demonstrate that EOG's reasonable use physically interfered with an already existing use by the plaintiffs of the surface, or at least one that was imminent, before there must be any balancing of interests under the accommodation doctrine, and plaintiffs cannot demonstrate this.

(3) But even if there must be a balancing of interests under the "accommodation doctrine," one reading of <u>Hunt Oil</u> and other authority that the court might find persuasive is that plaintiffs cannot prevail based on the undisputed facts of this case given that they were not using their property for a use that (1) was materially interfered with by EOG's reserve pit, or (2) would require the disturbance of the buried wastes when plaintiffs re-occupied the area of the buried pit or at any time in the immediate future given the rural character of the property.

(4) While some view the ability of a mineral developer to leave drilling wastes on the property buried near the surface as being unreasonable, this must be viewed with some perspective. The mineral estate in North Dakota is deemed dominant, and the relative impact of leaving the wastes behind in these circumstances is likely much less than the impacts that would result if, for example, the mineral being developed required surface mining. Further, there appears to be nothing that would prohibit the state legislature or, perhaps, also the Industrial Commission, from (1) prohibiting the use of reserve pits altogether, (2) requiring complete removal of the pits and the waste contained therein to permitted waste disposal sites after drilling is completed,

11

or (3) allowing the use of reserve pits, including leaving them in place after drilling is completed, if the mineral developer can reach a separate accommodation with the landowner.[3] The point here being that, if further regulation and control of reserve pits is required, it should be done by state regulatory authorities with more expertise in these matters and not by the court on what may have to be a case-by-case basis.[4]

See, e.g., Hunt Oil, supra, see also Amoco Production Company v. Thunderhead Investments, Inc., 235 F. Supp. 2d 1163 (D. Colo. 2002); Sun Oil. Co. v. Whitaker, 482 S.W.2d 808 (Tex. 1972); Getty Oil Co. v. Jones, 470 S.W.2d 618 (Tex. 1971); see generally Christopher M. Alspach, Surface Use

---

[3] In fact, as this is being written, the Industrial Commission has before it the draft of amended rules that further restrict the use of reserve pits. See North Dakota Industrial Commission, Notice of Proposed Rulemaking dated September 23, 2011,WL 2011 ND REG TEXT 271514 (NS). And, it appears from recent press reports that some are advocating as part of this regulatory process that they be done away with entirely.

[4] The other arguments that EOG makes, while they might carry the day, do not appear to be as compelling. One argument is that the Industrial Commission's reserve pit regulation trumps whatever property rights may be involved and is dispositive with respect to EOG's right to use a reserve pit. However, it is not at all clear that the regulation substantively alters existing property rights. For example, while this case involves a severed mineral interest, EOG's lease could have been from a person who owned both the surface and mineral estates and EOG's lease could have been written to forbid the use of reserve pits (thereby requiring the use of an alternative method of storing the drilling mud and capturing the drilling wastes) or to require that the reserve pits be completely reclaimed and all wastes removed from the property upon completion of drilling. Under EOG's argument, the regulation would trump the ability of a landowner in this situation to limit the use of reserve pits or prohibit buried wastes as a matter of contract, which does not appear to be its intent. In other words, it seems more probable that the Industrial Commission's regulation governs the use of reserve pits if they are used, but does not purport to realign or alter the property rights of the respective parties. That being said, the fact the Industrial Commission (1) allows the use of reserve pits and (2) allows them to remain in place filled with certain drilling wastes after drilling is completed, provided the pits are properly reclaimed, would appear to be highly relevant with respect to the determination of what is reasonable use of the surface by the dominant mineral estate as already discussed above.

EOG also argues that, as a matter of common law, it had no obligation to reclaim plaintiffs' property and that, but for the Industrial Commission's reclamation requirements, it could have walked away, leaving the reserve pit open and full of wastes, without any obligation of reclamation. While that may be the common law in some states (and years ago may have been the law or the practical result in North Dakota), it appears unlikely this is the law now, given what the North Dakota Supreme Court has stated in Hunt Oil, supra, that the use of the surface by the mineral owner must be reasonable and cannot be negligent or wanton. In other words, while restoring the land to pre-existing conditions may not be required, it seems likely that a reasonable amount of reclamation would be, with any state regulations being highly probative of what is reasonable. See Slaaten v. Cliff's Drilling Co., 748 F.2d 1275 (8th Cir. 1984); Bonds v Sanchez-O'Brien Oil & Gas Co., 715 SW2d 444, 446 (Ark. 1986); Smith v. Schuster, 66 So.2d 430, 431-432 (La. Ct. App. 1953); contra e.g., Fox v. Cities Serv. Oil Co., 200 P.2d 398, 401 (Okla. 1948) (citing other authority).

12

by the Mineral Owner: How Much Accommodation is Required under Current Oil and Gas Law?, 55 Okla. L. Rev. 89, 91-108 (2002) ("Alspach").

But while EOG has persuasive arguments, it is by no means guaranteed of prevailing at this stage. Here, plaintiffs' argument appears to be that regardless of what might be the law in other states, Hunt Oil requires that the finder of fact balance the interests of the parties once the surface owner has introduced evidence that there was a viable alternative available that would have eliminated or lessened a negative impact being imposed on the surface owner. And, according to the plaintiffs, this is not limited to a physical interference with the surface owners' use, but also would include such things as exposing the surface owner to the potential diminishment of the value of their property caused by the existence of the buried wastes and also the possibility of their future liability for the wastes. In addition, plaintiffs argue that past industry practice and the Industrial Commission's regulations are simply factors to be weighed along with everything else and are not dispositive. Favoring plaintiffs' position is some of the broad language used by the North Dakota Supreme Court in Hunt Oil, supra.[5] In addition, though the exploration methods at issue in Hunt Oil appear to have been well-established standard industry practices, the court did not stop there and rest its decision on that point. Also, it appears that the courts in some jurisdictions have adopted a more expansive version of the accommodation doctrine than the one that EOG claims would be

---

[5] For example, the court at one point stated:
Where alternatives do exist, however, the concepts of due regard and reasonable necessity do require a weighing of the different alternatives against the inconveniences to the surface owner. Therefore, once alternatives are shown to exist a balancing of the mineral and surface owner's interest does occur.
283 N.W.2d at 137. Also, the court stated the following toward the end of its opinion:
The oil companies were not required to show their proposed activities were the most reasonable or even that other alternatives were unreasonable in the absence of the Kerbaughs' bringing the reasonableness of other alternatives into issue. . . . . It was the Kerbaughs' burden to show the proposed activities were unreasonable by reason of the existence of other alternatives.
283 N.W.2d at 139. On the other hand, there is other language in the opinion that EOG can point to as supporting its positions.

controlling. Cf. Gerrity Oil & Gas Corp., 946 P.2d 913 (Colo. 1997) (en banc); see generally Alspach, 55 Okla. L. Rev. at 91-108.

With respect to the decision that needs to be made now regarding the timing of discovery, it does appear that EOG has a significant chance of prevailing as a matter of law with respect to its right to use a reserve pit. And, if so, that would likely negate any claim of trespass, nuisance, or negligence arising out of the use of the reserve pit unless plaintiffs can prove something more, *e.g.*, that the reserve pit is leaking contaminant or that, in using or reclaiming the pit, EOG violated an Industrial Commission regulation.[6]

It also appears that ruling on the reserve pit issue now could result in significant cost savings for the parties and not unduly prolong the case. Not only would a ruling in EOG's favor eliminate the necessity for much of the discovery directed toward the reasonableness of reserve pit use, it would also save both parties the time and expense of the experts' costs that likely would be incurred to litigate the issue, which could be significant considering all of the factors that the experts might be called upon to consider, as well as the expert discovery that would also likely follow. Consequently, the court will defer ruling on that part of plaintiffs' motion to compel that seeks further discovery related to the reasonableness of EOG's use of a reserve pit and the possible alternatives until Judge Hovland has ruled on the merits of EOG's summary judgment motion or has decided not to rule until discovery has been completed.

However, since there is the possibility that the discovery requests related to the reserve pit issue may have to be revisited in the future, the following observations are offered, without any final

---

[6] While violation of an Industrial Commission may not create a private cause of action for damages, it may be evidence of negligence or a nuisance. E.g., Kimball v. Landeis, 2002 ND 162, ¶ 15, 652 N.W.2d 330; Knoff v. American Crystal Sugar Co., 380 N.W.2d 313, 317-318 (N.D. 1986).

14

rulings being made, with the hope that the parties may able to resolve the disputed discovery on their own, should that be necessary:

- If the court denies EOG's motion for summary judgment on the reserve pit issue, whether EOG used "closed loop" systems in lieu of reserve pits elsewhere (and not just in North Dakota) would appear to be fair game along with the reasons why "closed loop" systems were used. That being said, it appears likely that plaintiffs can obtain sufficient information on this point without requiring EOG to identify each and every well where "closed loop" systems are being used by narrowing their demands and/or taking a Rule 30(b)(6) deposition of a person or persons designated by EOG to testify on these points.[7]

- EOG documents that discuss the benefits of reserve pits over closed-end systems, or vice versa, would also appear to be fair game with some constraints and without requiring a search of thousands of individual well files.

- Some discovery of why EOG is not permitted to use reserve pits in some jurisdictions or locations (assuming that to be true) may also be permitted.

- The court would have to be convinced that the benefits of plaintiffs obtaining the detailed cost information that is sought for potentially thousands of wells outweigh the burdens of producing this information. This is particularly true since plaintiffs can likely obtain comparable information that is available publically (including from

---

[7] EOG has objected to the discovery requests seeking information about the use of "closed loop" systems in part on the grounds that the term is too vague. This objection is without merit in that what is obviously being sought here is information about those systems that eliminate the need for reserve pits, and EOG appears to have understood that point in responding to some of the discovery requests.

15

vendors of "closed loop" systems) or from qualified experts.[8] Also, with respect to the alternative now of reclaiming the buried pit by digging it up and trucking the liner and buried wastes to a permitted disposal site, it seems likely that any engineering expert worth his or her salt should be able to come up with an estimate of the costs for accomplishing this task without a substantial amount of effort.

On the other hand, some discovery of costs on a more tailored basis may be permitted. Also, if costs become an issue and EOG wants to offer its own opinions and cost information (including any claim that a reserve pit alternative, such as a "closed loop" system, would have been more costly or economically infeasible in this case), then it may be unfair to deny plaintiffs some discovery, if for no other reason than to verify and/or contest EOG's information.

- Some discovery regarding whether EOG has had problems with buried reserve pits leaking or leaching contaminants may be permissible, but discovery on a well-by-well basis appears to be overly burdensome.

C.  **The discovery that plaintiffs claim is needed with respect to the issue of proper compensation**

A number of plaintiffs' discovery requests seek information about payments or offers of payment that EOG has made to other surface owners for damages, including those located in Manitoba, Canada. EOG objects to these requests on the grounds that the payments and offers of

---

[8] Moreover, plaintiffs' belief that they need detailed EOG cost information to make their case may turn out to be unfounded. If the issue of reasonableness must be litigated, plaintiffs may be able to make a *prima facie* case based simply on the fact that alternatives to reserve pits exist and are being used, which may already be established by the Industrial Commission regulation quoted earlier, as well as EOG's admission that it has used closed loop systems as an alternative to reserve pits elsewhere. In other words, it is not at all clear that plaintiffs' initial burden extends to having to prove the alternatives are more economically feasible in a particular setting, and that if the mineral developer wants to make this an issue, it is incumbent upon the mineral developer to come forward with the evidence that such alternative uses were not economically feasible. See Gerrity Oil & Gas Corp., 946 P.2d at 933-934.

payment are irrelevant and unlikely to lead to discoverable evidence. Plaintiffs respond by stating that their "experts will need the information about EOG's other surface damage payments in North Dakota and Manitoba in order to form an opinion about the validity of EOG's $8,000 offer to Kartch and in order to form their own opinions about Kartch's damages for lost land value, lost access to and use of the land, and loss of agricultural production."

Here, the court agrees with EOG for two reasons. First, the compensation that must be paid pursuant to N.D.C.C. § 38-11.1-04 includes compensation for "loss of agricultural production and income, lost land value, lost use of and access to the surface owner's land, and lost value of improvements." Since the statute does not set forth the manner in which these damages are to be determined, the court must assume that the general law in North Dakota for determining damages to real property and loss of its use applies. This law requires a determination that is specific to the particular property involved. See N.D.C.C. § 32-03-09.1. And given the large number of possible variables, it is an inherently unique determination in each case.

Second, for most of the damage calculations, some determination of fair market or fair rental value is required. Under North Dakota law, "fair market value" is what a willing buyer would pay and a willing seller would accept, neither being under a compulsion or obligation to buy or sell. See, e.g., Nuveen v. Nuveen, 795 N.W.2d 308, 313 (N.D. 2011); Mike Golden, Inc. v. Tenneco, Oil Co., 450 N.W.2d 716, 719-720 (N.D. 1990); Bernhardt v. Rummel, 314 N.W.2d 50, 59-60 (N.D. 1981); cf. Little v. Burleigh County, 82 N.W.2d 603, 608-609 (N.D. 1957). Compulsory damage payments do not fit this criteria. In addition, given that the amounts of such payments may be based in part upon other factors, such as the time, expense, and uncertainty of litigation, they are not probative evidence of fair market value. Cf., e.g., United States v. 10.48 Acres of Land, 621 F.2d 338, 339-

17

340 (9th Cir. 1980) (evidence of price paid for a flowage easement over other land in a condemnation setting not relevant to the determination of the fair market value of the flowage easement at issue); Evans v. United States, 326 F.2d 827, 831 (8th Cir. 1964) (evidence of price paid by the government for other land that was to be condemned not relevant as to the value of the land at issue in the case before the court). In fact, N.D.C.C. § 38-11.1-09 gives surface owners the right to recover their reasonable attorney's fees and costs if the amount of compensation awarded to them exceeds the amount of the mineral developer's damage offer. Obviously, this creates an incentive for mineral developers to pay more than what strictly might be compensable as a matter of fair market value in order to avoid these costs, which, in many cases, may exceed the amounts that are compensable.

Consequently, the court will deny the motion to compel with respect to the discovery requests that seek information regarding payments or offers of payment to other surface owners.

C.  Requests for production Nos. 29 & 30

Plaintiffs seek documents, correspondence, and e-mails along with enclosures and attachments exchanged between EOG and its agents and the person or entity that installed the pit liner used by EOG. EOG produced only the invoice for the liner, a copy of the specification sheet, and a copy of the master service's contract with the installer. There are issues relating to the tear of the liner and whether there was any leakage, and it is certainly conceivable that the documents and communications requested may contain evidence that would be relevant or lead to the further discovery of relevant evidence related to these matters.

EOG appears to contend that any leakage is relevant only if there has been some contamination to the surface or groundwater and that tests so far have indicated no contamination. EOG also argues that plaintiffs have not done the testing that EOG claims is required to establish a

baseline in order to recover the costs of securing water from replacement sources under ch. 38-11.1. However, the testing done by the Health Department appears to have been limited. Further, it is doubtful that the inability of plaintiffs to produce a water quality test taken in advance forecloses all rights of relief for damages to the water supply, particularly with respect to the common law claims of trespass, negligence, and/or nuisance. Finally, just the mere fact that the reserve pit is leaking (if it is) or has the potential to leak may affect the land value of the property.

The court will grant the motion to compel with respect to Requests for Production Nos. 29 & 30 insofar as they relate to the pit liner and the well site at issue in this case. The court will reserve judgment regarding whether any further discovery of documents and correspondence related to pit liners for other wells will be permitted - if that is in fact being sought, which is not at all clear.

To the extent that plaintiffs believe that they need to complete this discovery before fully responding to all of the points raised in EOG's motion for summary judgment, they must comply with the requirements of Rule 56 in terms of bringing this to the attention of the court. It does not appear, however, that plaintiffs need this discovery for the court's resolution of the issue of whether EOG had the right to use the reserve pit as matter of law assuming no problems with pit or compliance with the Industrial Commission's regulations.

### III.  ORDER

Based on the foregoing, plaintiffs' motion to compel is **GRANTED IN PART, DENIED IN PART,** and **DEFERRED IN PART** as follows:

1. Plaintiffs' motion to compel is granted with respect to Requests for Production of Documents Nos. 29 & 30 insofar as they relate to the pit liner and the well site at

issue in this case. Absent a further extension from the court, this material should be produced for inspection within fifteen days.

2. Plaintiffs' motion to compel is denied as to Interrogatory No. 10; Requests for Production of Documents Nos. 11, 17, 23; and Requests for Admissions Nos. 7 & 9.

3. Plaintiffs' motion to compel is deferred pending a ruling on EOG's motion for summary judgment as to Interrogatory Nos. 2, 3, 7, 14, & 16; Requests for Production of Documents Nos. 1, 12, 14, 21, 24, 29 & 30 (to the extent not granted above), and 35; and Requests for Admissions Nos. 4 & 5. If plaintiffs believe that Judge Hovland's ruling does not moot the need for this discovery, plaintiffs' counsel shall first discuss the matters in dispute one more time with counsel for EOG in light of the guidance set forth above and then, as to any matters that cannot be resolved, plaintiffs' counsel shall contact the chambers of the undersigned and a date will be set for a hearing.

**IT IS SO ORDERED.**

Dated this 10th day of November, 2011.

> /s/ Charles S. Miller, Jr.
> Charles S. Miller, Jr.
> United States Magistrate Judge