**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NORTH DAKOTA**
**NORTHWESTERN DIVISION**

| | | |
|---|---|---|
| Frankie Kartch and Kristin Kartch, | ) | **ORDER GRANTING, IN PART,** |
| | ) | **DEFENDANTS' MOTION FOR** |
| Plaintiffs, | ) | **SUMMARY JUDGMENT** |
| | ) | |
| vs. | ) | |
| | ) | Case No. 4:10-cv-014 |
| EOG Resources, Inc., a foreign business | ) | |
| corporation, | ) | |
| | ) | |
| Defendant. | ) | |

Before the Court is the Defendant's motion for summary judgment filed on August 25, 2011.

See Docket No. 46.  The Plaintiffs filed a brief in opposition to the motion on November 28, 2011.

See Docket No. 74.  The Defendant filed a reply brief on December 21, 2011, and an amended reply

brief on December 28, 2011.  See Docket Nos. 80 and 83.  Oral arguments were presented by the

parties on February 24, 2012.  For the reasons explained below, the Defendant's motion is granted

in part and denied in part.


I.      **BACKGROUND**

The plaintiffs, Frankie Kartch and Kristin Kartch, own the surface rights to land located in

Mountrail County, North Dakota.  On March 29, 2004, Frankie Kartch purchased all of Section 17,

Township 158, Range 89 West in Mountrail County, North Dakota, from Rodney Iverson and Linda

Iverson.  See Docket No. 13-1, pp. 37-39.  The Iversons retained the mineral rights.  The Kartches

currently rent out the land for farming.  Frankie Kartch has also hunted and camped on the land.

On November 30, 2006, the Iversons leased their mineral interest in Section 17 to Ritter, Laber & Associates, Inc.  <u>See</u> Docket No. 13-2.  On November 26, 2007, Ritter, Laber & Associates, Inc. assigned the lease to defendant EOG Resources, Inc. ("EOG").  <u>See</u> Docket No. 13-3.

On August 25, 2008, Contex Energy Company ("Contex") sent a notice to the Kartches stating:

> Pursuant to Chapter 38-11.1 of the North Dakota Century Code, you are hereby notified that EOG Resources, Inc. ("EOGR") of P.O. Box 4362, Houston, Texas 77210-4326, intends to commence or cause to be commenced the drilling of its Crowfoot #1-17H Well at the following location:
>
> <u>Township 158 North, Range 89 West, 5th P.M.</u>
> Section 17: NW1/4NW1/4
>
> The enclosed Access and Damage Settlement Agreement describes the amount of land to be used for the Crowfoot #1-17H well and appurtenant facilities as well as the compensation offered for such use.  EOGR estimates that drilling operations will take from 40 to 45 days.  After rig release, facilities will be constructed and then completion operations are commenced.  These activities typically take an additional 30 days depending on weather and equipment and personnel availability.  EOGR respectfully requests your waiver of the required twenty (20) day notice of its intent to drill so that it has the option of commencing well site construction before the expiration of said twenty (20) day notice period.

<u>See</u> Docket No. 7-3.  EOG offered to pay the Kartches $8,000:

> as surface damages to build the Access Road and Drillsite location, to drill a well(s) for the purposes of developing the minerals underlying said Section 17, Township 158 North, Range 89 West, and in the event the well(s) is completed as producer, to install, construct and maintain on the Drillsite equipment and facilities for production, storage, transportation and/or marketing of produced substances.

<u>See</u> Docket No. 7-1.  The Kartches did not accept EOG's offer.

2

After the Kartches received the notification from Contex, their attorney sent letters on their behalf to Contex and EOG requesting that EOG use a closed loop system, rather than a reserve pit.[1] See Docket No. 76.  The Kartches did not receive a response from either Contex or EOG.  Frankie Kartch stated in an affidavit, "I also had a phone call with [Ty] Stillman [of EOG] in the fall of 2008 where I again verbally requested a closed loop system on our property.  His response: 'I would have needed to know about that six months ago.'" See Docket No. 76.

On January 23, 2009, the Kartches purchased the surface interest in portions of Sections 7 and 8, Township 158, Range 89 West in Mountrail County, North Dakota.  See Docket No. 13-1, pp. 41-47.  The Kartches currently rent out Sections 7 and 8 for farming.  There is a house located on Section 8 that the Kartches also rent out.

In December 2008, EOG drilled a well on Section 17.  In an affidavit, Jim Schaefer of EOG explained:

> 2.      EOG entered the surface and began drilling the Crowfoot 1-17H well, located in the NW 1/4 of Section 17 of Township 158 North, Range 89 West of the 5th P.M., Mountrail County, North Dakota, in 2008.  It completed the well in 2009.  The well produces oil and EOG has been marketing the oil.  EOG is now using less surface area than when it drilled the well.
>
> 3.      EOG reclaimed the reserve pit at the well site in October 2009. . . .
>
> . . .
>
> 7.      EOG has been flaring the gas produced at the Crowfoot 1-17H well site using a single flare. . . .

See Docket No. 49.

---

[1]  A reserve pit is "an earthen pit used for collecting and storing water, drilling fluid, produced oil, drilling mud, and well cuttings when a well is being drilled."  See Docket No. 49.  In a closed loop system "[t]he drill cuttings go into a steel container . . . and are hauled away to a waste disposal site, and all of the liquid phase . . . stays within the rig mud tanks and steel tanks and is reused, recycled or hauled to a disposal site."  See Docket No. 74-3, p. 23.

According to Mark Zaun, the construction foreman for EOG's North Dakota operations, EOG lined the reserve pit with a synthetic liner.  See Docket No. 53.  On June 17, 2009, a tear was discovered in the liner.  See Docket No. 75-1.  Zaun explained the process of reclaiming the reserve pit:

> In October 2009, after the well had been completed, EOG reclaimed the reserve pit. During the reclamation process, the fluids were removed.  The fluids and solids were run through a centrifuge.  The solids were returned to the pit and the fluids were taken to a state-approved disposal site.  To address the tear that had occurred in the liner, the earth behind the tear and along its sides was removed under the direct supervision of the North Dakota Oil and Gas reclamation specialist, Nathaniel Erbele.  A wooden pallet and some miscellaneous pieces of lumber from an unknown source were removed.  Dirt was mixed into the remaining solids.  The excess pit liner was folded over the solids, and the solids were covered with at least four feet of earth that had been dug from the pit.  The area was then sloped to promote surface drainage away from the reclaimed pit area.

See Docket No. 53.

On August 13, 2009, before the reserve pit was reclaimed, the Kartches filed a complaint in Mountrail County, North Dakota, alleging that they had not entered into a contract for compensation with EOG as required by N.D.C.C. § 38-11.1-04.  See Docket No. 1-4.  The Kartches also allege that EOG, or agents working on EOG's behalf, dumped waste on the well site, failed to properly maintain the site, and did not properly protect underground water.  EOG removed the case to federal district court on September 4, 2009.  See Docket No. 1-6.  The Kartches objected and the Court remanded the case back to state district court on December 15, 2009.  See Docket No. 1-22.  EOG again removed the case to federal district court on March 4, 2010.  See Docket No. 1.

On February 1, 2011, the Kartches filed a second amended complaint.  See Docket No. 33. The second amended complaint sets forth four separate causes of action.  In the first cause of action, the Kartches claim they have incurred damages:

for loss of agricultural production and income by the current tenant and for future farming and ranching operations; lost land value from Defendant's direct use of the surface estate, as well as a diminution in land value caused by Defendant's waste pit and the chemicals and toxins remaining in the land and water and other nuisances and unreasonable uses of the surface estate; lost use of and access to Plaintiffs' surface estate for hunting, recreation, farming and ranching; and lost value of improvements caused by drilling operations.

See Docket No. 33.  The Kartches acknowledge that EOG offered $8,000 as compensation for surface damages, but argue that the offer is inadequate.

In the second cause of action, the Kartches allege that EOG's use of a reserve pit was not reasonably necessary and violated N.D.C.C. ch. 38-11.1.  The Kartches claim that alternatives to a reserve pit exist, including, but not limited to, a closed loop system.  The Kartches also allege that EOG did not exercise ordinary care in the construction and maintenance of the reserve pit, resulting in the tear in the liner and contamination of the surrounding soil and water.  The Kartches further allege that activity on the site–including the use of a reserve pit rather than a reasonable alternative, burial of toxic waste in the reserve pit, excessive noise and odor, litter, and storage of unnecessary equipment–constitutes a nuisance in violation of N.D.C.C. § 42-01-01.

In the third cause of action, the Kartches claim that EOG failed to provide proper notice pursuant to N.D.C.C. § 38-11.1-05 because they did not provide a plat map or notice that a reserve pit would be used.  The Kartches allege that EOG's insufficient notice prevented the Kartches from demanding a reasonable alternative to a reserve pit and prevented meaningful negotiation between the parties.

In the fourth cause of action, the Kartches claim that EOG is trespassing on their land.  They allege that liner and waste that remain in the reserve pit constitute a trespass and cause unnecessary damage to the surface estate.

On August 25, 2011, EOG filed a motion for summary judgment.  See Docket No. 46.  EOG contends that it is entitled to use a reserve pit as a matter of law because the North Dakota Industrial Commission regulates and permits reserve pit use.  EOG argues in the alternative that, if common law principles apply, the use of a reserve pit is reasonable and within EOG's rights as the dominant estate owner.  EOG further argues that the other activities the Kartches complain about are reasonably necessary for EOG's drilling, exploration, and production activities.

On September 21, 2011, the Kartches filed a motion to compel discovery.  See Docket No. 58.  The Court allowed the Kartches to respond to EOG's summary judgment motion after it ruled on the discovery motion.  See Docket Nos. 64 and 72.  On November 10, 2011, Magistrate Judge Charles S. Miller, Jr. issued an order granting in part, deferring in part, and denying in part the Kartches' motion to compel.  See Docket No. 73.  Judge Miller stated:

> With respect to the decision that needs to be made now regarding the timing of discovery, it does appear that EOG has a significant chance of prevailing as a matter of law with respect to its right to use a reserve pit.  And, if so, that would likely negate any claim of trespass, nuisance, or negligence arising out of the use of the reserve pit unless plaintiffs can prove something more, *e.g.*, that the reserve pit is leaking contaminant or that, in using or reclaiming the pit, EOG violated an Industrial Commission regulation.
>
> It also appears that ruling on the reserve pit issue now could result in significant cost savings for the parties and not unduly prolong the case.  Not only would a ruling in EOG's favor eliminate  the necessity for much of the discovery directed toward the reasonableness of reserve pit use, it would also save both parties the time and expense of the experts' costs that likely would be incurred to litigate the issue, which could be significant considering all of the factors that the experts might be called upon to consider, as well as the expert discovery that would also likely follow.  Consequently, the court will defer ruling on that part of plaintiffs' motion to compel that seeks further discovery related to the reasonableness of EOG's use of a reserve pit and the possible alternatives until Judge Hovland has ruled on the merits of EOG's summary judgment motion or has decided not to rule until discovery has been completed.

See Docket No. 73, p. 14 (emphasis in original).

On November 28, 2011, the Kartches filed a response in opposition to EOG's motion for summary judgment.  See Docket No. 74.  The Kartches contend that the record before the Court is not adequate and that the Court should allow their requested discovery before ruling on EOG's motion.  The Kartches further argue that the reasonableness of EOG's use of a reserve pit should be decided by the fact finder, not as a matter of law. The Kartches also contend that the evidence shows EOG's activities interfere with their pre-existing use of the land.

II.    **STANDARD OF REVIEW**

Summary judgment is appropriate when the evidence, viewed in a light most favorable to the non-moving party, indicates that no genuine issues of material fact exist and that the moving party is entitled to judgment as a matter of law.  Davison v. City of Minneapolis, Minn., 490 F.3d 648, 654 (8th Cir. 2007); see Fed. R. Civ. P. 56(c).  Summary judgment is not appropriate if there are factual disputes that may affect the outcome of the case under the applicable substantive law.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  An issue of material fact is genuine if the evidence would allow a reasonable jury to return a verdict for the non-moving party.

The Court must inquire whether the evidence presents a sufficient disagreement to require the submission of the case to the fact-finder or whether the evidence is so one-sided that one party must prevail as a matter of law.  Diesel Mach., Inc. v. B.R. Lee Indus., Inc., 418 F.3d 820, 832 (8th Cir. 2005).  The moving party bears the burden of demonstrating an absence of a genuine issue of material fact.  Simpson v. Des Moines Water Works, 425 F.3d 538, 541 (8th Cir. 2005).  The non-moving party "may not rely merely on allegations or denials in its own pleading; rather, its response must . . . set out specific facts showing a genuine issue for trial." Fed. R. Civ. P. 56(e)(2).  However,

Rule 56(d) provides:

> If a nonmovant shows by affidavit or declaration that, for specified reasons, it cannot present facts essential to justify its opposition, the court may:
>
> > (1)      defer considering the motion or deny it;
> >
> > (2)      allow time to obtain affidavits or declarations or to take discovery; or
> >
> > (3)      issue any other appropriate order.

Fed. R. Civ. P. 56(d).

This action is based on diversity jurisdiction.  Therefore, the Court will apply the substantive law of North Dakota.  See Paracelsus Healthcare Corp. v. Philips Med. Sys., Nederland, B.V., 384 F.3d 492, 495 (8th Cir. 2004).

III.     **LEGAL DISCUSSION**

Chapter 38-11.1 of the North Dakota Century Code provides for compensation to surface owners for damage related to oil and gas production.   N.D.C.C. § 38-11.1-04 states, in pertinent part:

> The mineral developer shall pay the surface owner a sum of money equal to the amount of damages sustained by the surface owner and the surface owner's tenant, if any, for loss of agricultural production and income, lost land value, lost use of and access to the surface owner's land, and lost value of improvements caused by drilling operations.  The amount of damages may be determined by any formula mutually agreeable between the surface owner and the mineral developer.  When determining damages, consideration must be given to the period of time during which the loss occurs and the surface owner may elect to be paid damages in annual installments over a period of time; except that the surface owner must be compensated for harm caused by exploration only by a single sum payment.  The payments contemplated by this section only cover land directly affected by drilling operations.  Payments under this section are intended to compensate the surface owner for damage and disruption.

8

N.D.C.C. § 38-11.1-04.  According to the statute, the determination of damages is to be made by negotiation between the parties.  If the parties are not able to agree, the surface owner may sue for damages.  <u>Murphy v. Amoco Prod. Co.</u>, 729 F.2d 552, 554 (8th Cir. 1984).  If the damages awarded by the court exceed the amount offered by the developer, the surface owner can collect costs and reasonable attorneys' fees.  <u>Id.</u> (citing N.D.C.C. § 38-11.1-09).

## A.   <u>EOG'S USE OF A RESERVE PIT</u>

EOG contends that the Kartches cannot recover for its use of a reserve pit because reserve pits are allowed and regulated by the North Dakota Industrial Commission, and the use of a reserve pit is within its rights as the dominant estate owner.  The Kartches contend that EOG's use of a reserve pit is not reasonably necessary for its drilling, exploration, and production activities and that reasonable alternatives exist.

The landmark case in North Dakota regarding the relationship between the rights of surface owners, mineral owners, and oil and gas lessees is <u>Hunt Oil Co. v. Kerbaugh</u>, 283 N.W.2d 131 (N.D. 1979).  In the case, the North Dakota Supreme Court explained:

> We have also considered the rights of the lessee under the usual oil and gas lease.  In <u>Feland v. Placid Oil Co.</u>, 171 N.W.2d 829, 834 (N.D. 1969), Chief Justice Teigen, speaking for the court, stated:
>
> > "Under a usual oil and gas lease, the lessee, in developing the leased premises, is entitled to use of the land reasonably necessary in producing the oil. . . .
> >
> > > "'Whether the express uses are set out or not, the mere granting of the lease creates and vests in the lessee the dominant estate in the surface of the land for the purposes of the lease; by implication it grants the lessee the use of the surface to the extent necessary to a full enjoyment of the grant.  Without

such use, the mineral estate obtained under the lease would be worthless. . . .' <u>Texaco, Inc. v. Faris</u>, 413 S.W.2d 147, 149 (Tex.Civ.App. 1967)."

The above cases recognize the well-settled rule that where the mineral estate is severed from the surface estate, the mineral estate is dominant. <u>See</u> Annot., 53 A.L.R.3d 16; 4 Summers, Oil and Gas, § 652; 58 C.J.S. Mines and Minerals § 159b. The mineral estate is dominant in that the law implies, where it is not granted, a legitimate area within which mineral ownership of necessity carries with it inherent surface rights to find and develop the minerals, which rights must and do involve the surface estate. Without such rights the mineral estate would be meaningless and worthless. Thus, the surface estate is servient in the sense it is charged with the servitude for those essential rights of the mineral estate.

In the absence of other rights expressly granted or reserved, the rights of the owner of the mineral estate are limited to so much of the surface and such use thereof as are *reasonably necessary* to explore, develop, and transport the minerals. <u>See</u>, <u>Union Producing Co. v. Pittman</u>, 245 Miss. 427, 146 So.2d 553 (1962); 58 C.J.S. Mines and Minerals § 159c; Annot., 53 A.L.R.3d 16 § 3[a]. In addition to, or underlying the question of what constitutes reasonable use of the surface in the development of oil and gas rights, is the concept that the owner of the mineral estate must have due regard for the rights of the surface owner and is required to exercise that degree of care and use which is a just consideration for the rights of the surface owner. <u>Getty Oil Co. v. Jones</u>, 470 S.W.2d 618, 621, 53 A.L.R.3d 1 (Tex. 1971). <u>Union Producing Co. v. Pittman</u>, <u>supra</u>; 58 C.J.S. Mines and Minerals § 159c; Annot., 59 A.L.R.3d 16 § 3[c]. Therefore, the mineral estate owner has no right to use more of, or do more to, the surface estate than is reasonably necessary to explore, develop, and transport the minerals. <u>Union Producing Co. v. Pittman</u>, <u>supra</u>; 58 C.J.S. Mines and Minerals § 159c. Nor does the mineral estate owner have the right to negligently or wantonly use the surface owner's estate. <u>See</u>, <u>Union Producing Co. v. Pittman</u>, <u>supra</u>; 4 Summers, Oil and Gas § 652.

<u>Hunt Oil Co.</u>, 283 N.W.2d at 135-36.

In <u>Hunt Oil Co.</u> the North Dakota Supreme Court adopted the "accommodation doctrine" as set forth by the Texas Supreme Court in <u>Getty Oil Co. v. Jones</u>, 470 S.W.2d 618 (Tex. 1971):

[U]nder the circumstances indicated here; i.e., where there is an existing use by the surface owner which would otherwise be precluded or impaired, and where under the

> established practices in the industry there are alternatives available to the lessee
> whereby the minerals can be recovered, the rules of reasonable usage of the surface
> may require the adoption of an alternative by the lessee.

Hunt Oil Co., 283 N.W.2d at 136 (quoting Getty Oil Co., 470 S.W.2d at 622).

The North Dakota Supreme Court also quoted the Utah Supreme Court's adoption of the

accommodation doctrine:

> [W]herever there exist separate ownerships of interests in the same land, each should
> have the right to the use and enjoyment of his interest in the property to the highest
> degree possible not inconsistent with the rights of the other. We do not mean to be
> understood as saying that such a lessee must use any possible alternative. But he is
> obliged to pursue one which is reasonable and practical under the circumstances.

Id. (quoting Flying Diamond Corp. v. Rust, 551 P.2d 509, 511 (Utah 1976)).

The North Dakota Supreme Court then quoted further from Getty Oil Co.:

> The reasonableness of a surface use by the lessee is to be determined by a
> consideration of the circumstances of both and, as stated, the surface owner is under
> the burden of establishing the unreasonableness of the lessee's surface use in this
> light.  The reasonableness of the method and manner of using the dominant mineral
> estate may be measured by what are usual, customary and reasonable practices in the
> industry under like circumstances of time, place and servient estate uses. . . . [I]n
> determining the issue of whether a particular manner of use in the dominant estate
> is reasonable or unreasonable, we cannot ignore the condition of the surface itself
> and the uses then being made by the servient surface owner. . . . If the manner of use
> selected by the dominant mineral lessee is the only reasonable, usual and customary
> method that is available for developing and producing the minerals on the particular
> land then the owner of the servient estate must yield.  However, if there are other
> usual, customary and reasonable methods practiced in the industry on similar lands
> put to similar uses which would not interfere with the existing uses being made by
> the servient surface owner, it could be unreasonable for the lessee to employ an
> interfering method or manner of use.  These [conditions] involve questions to be
> resolved by the trier of the facts.

Id. at 136-37 (quoting Getty Oil Co., 470 S.W.2d at 627-628).

Finally, the Court explained:

> Whether or not the use of the surface estate by the mineral estate owner is
> reasonably necessary is a question of fact for the trier of facts.  Slope County Board

11

<u>of County Commissioners v. Consolidation Coal Co.</u>, 277 N.W.2d 124 (N.D. 1979); <u>Getty Oil Co. v. Jones</u>, <u>supra</u>.   In addition, the burden of proof in such a determination is upon the servient estate owner.  <u>Getty Oil Co. v. Jones</u>, <u>supra</u>.

<u>Id.</u> at 137.  Therefore, the burden lies with the Kartches to show that EOG's use of a reserve pit is unreasonable, considering the existing use of the land for farming.

EOG contends that its use of a reserve pit is not unreasonable because the North Dakota Industrial Commission permits and regulates their use.  The North Dakota Industrial Commission rule in effect at the time EOG drilled the well in 2008 provides, in pertinent part:

> In order to assure a supply of proper material or mud-laden fluid to confine oil, gas, or water to its native strata during the drilling of any well, each operator shall provide, before drilling is commenced, a container or reserve pit of sufficient size to contain said material or fluid, and the accumulation of drill cuttings.  <u>A reserve pit may be utilized to contain solids and fluids used and generated during well drilling and completion operations, providing the pit can be constructed, used and reclaimed in a manner that will prevent pollution of the land surface and freshwaters</u>.  In special circumstances, the director may prohibit construction of a reserve pit or may impose more stringent pit construction and reclamation requirements.  Under no circumstances shall reserve pits be used for disposal, dumping, or storage of fluids, wastes, and debris other than drill cuttings and fluids used or recovered while drilling and completing the well.

> Reserve pits shall not be located in, or hazardously near, bodies of water, nor shall they block natural drainages.  No reserve pit shall be wholly or partially constructed in fill dirt unless approved by the director.

N.D.A.C. § 43-02-03-19 (2008) (emphasis added).  The North Dakota Industrial Commission also regulates fencing and netting of reserve pits, disposal of waste contained in a reserve pit, and the types of materials that can be contained in a reserve pit.  N.D.A.C. §§ 42-03-02-19.1, 19.2, and 19.3 (2008).

It is well-established in North Dakota that violation of a rule or statute is evidence of negligence, but is not negligence per se.  <u>Larson v. Kubisiak</u>, 1997 ND 22, ¶ 8, 558 N.W.2d 852 (citing <u>Horstmeyer v. Golden Eagle Fireworks</u>, 534 N.W.2d 835, 838 (N.D. 1995); <u>Ebach v. Ralston</u>,

12

510 N.W.2d 604, 611 (N.D. 1994); <u>Gronneberg v. Hoffart</u>, 466 N.W.2d 809, 812 (N.D. 1991);

<u>Glawe v. Rulon</u>, 284 F.2d 495, 497 (8th Cir. 1960)).  Conversely, compliance with a rule or statute

is evidence of reasonableness, but it is not dispositive as to an activity's reasonableness.

Accordingly, the fact that the North Dakota Industrial Commission's rules permit the use of a

reserve pit is evidence that EOG's use of a reserve pit, rather than a closed-loop system, is

reasonable but it is not dispositive.

Nathaniel Erbele, a petroleum resource specialist with the North Dakota Oil & Gas Division,

testified in a deposition regarding the use of reserve pits in North Dakota:

> Q.    Is it common for oil and gas operators in North Dakota to use reserve pits?
>
> A.    Yes, it is.
>
> Q.    Would you say that it's standard operating procedure?
>
> MR. BRAATEN:    Object to foundation.
>
> THE WITNESS:    They are not used in every case.  They are common.
>
> Q.    (MR. BOSCHEE CONTINUING) Okay.  Is it a common practice for the oil and gas operator to bury the reserve pit solids on site in the reserve pit?
>
> MR. BRAATEN:    Object to foundation.
>
> THE WITNESS:    Yes.
>
> Q.    (MR. BOSCHEE CONTINUING) And you know this because of your experience as being a reclamation supervisor?
>
> A.    Yes.
>
> Q.    With respect to the use of reserve pits being common, you know that as well from your experience being a reclamation supervisor?
>
> A.    Yes.

Q.     I'm going to see if you can agree with this.  If not, tell my why.  Are there thousands of wells in North Dakota that have reserve pits that are buried?

A.     I would say that is accurate.  I don't have direct knowledge of all thousands of reserve pits.

Q.     But based upon the number of wells that have been drilled in North Dakota and it being a common practice, would that be a reasonable estimate that there's thousands of them?

A.     I think it would be reasonable.

See Docket No. 47-5, pp. 7-8.

Lynn Helms, director of the Department of Mineral Resources under the North Dakota

Industrial Commission, also testified in a deposition regarding the use of reserve pits:

Q.     Is there any kind of a process that a company has to follow through with in order to get approval to use a reserve pit?

A.     Yes. Reserve pits are pretty much standard.  However, there is always the authority of the field inspector to deny use of a reserve pit based on test excavation that takes place at the site to check the type of soil, check for groundwater, things like that.

Q.     Can you elaborate on that?

A.     The presumption is that reserve pits can be built and properly reclaimed in general in North Dakota, but if certain conditions are encountered during digging, some test digging and also the actual digging of the pit, itself, then it will be – that approval will be revoked and the pit will have to be moved off site or eliminated.

See Docket No. 74-3, p. 12.

Helms testified that closed loop systems have been "very uncommon" until recently:

A.     Through the 1990s and up until as recently as five years or so ago, the technology and the equipment hadn't really been put together with the exception of wells on the North Slope in Alaska to make it cost-effective to do them.  It requires things that are called hydrocyclones and centrifuges and filters and three-sided steel tanks and all sorts of things that have been not necessarily invented, but adapted and

put together to make the technology, to bring it to the point where in today's world it's equal to or only slightly more expensive than the conventional way.

. . .

Q.     I think it was 2005 you said that they started becoming more common?

A.     I believe so, yeah.

Q.     And is that because they became more cost-effective around that time?

A.     Yes.  The equipment required to do it in the appropriate sizes was beginning to be manufactured by mud companies and marketed and was available, manpower was available and trained, mm-hmm.

Q.     Within the last six years we've gone from a situation where relatively few companies were using semi-closed loop systems to the point where now companies like EOG are using nothing other than semi-closed loop systems, is that right?

A.     Yeah, that would be accurate.

See Docket No. 74-3, pp. 27, 34.

Helms testified at a second deposition regarding the use of reserve pits over time in North Dakota.  He testified, "In the 1980s reserve pits were used on every well drilled."  See Docket No. 74-4, p. 4.  He also stated, "To the best of my knowledge, every well drilled in 2008, 2009 had a reserve pit that contained liquid and solid from the drilling mud."  See Docket No. 74-4, p. 5 (errors in original).

The Kartches contend that EOG's use of a reserve pit in 2008-2009 was unreasonable, given the alternative of a closed loop system.  The Court disagrees.  Under the accommodation doctrine, the existence of an alternative is not sufficient to render the developer's use of the land unreasonable.  As the North Dakota Supreme Court explained, "The reasonableness of the method

15

and manner of using the dominant mineral estate may be measured by what are usual, customary and reasonable practices in the industry under like circumstances of time, place and servient estate uses." Hunt Oil Co., 283 N.W.2d at 136 (quoting Getty Oil Co., 470 S.W.2d at 627-28).  The testimony of Nathaniel Erbele and Lynn Helms clearly establishes that in 2008 and 2009, when EOG drilled and reclaimed the well, reserve pits were commonly used in North Dakota.  In particular, Lynn Helms testified that every well drilled in North Dakota in 2008 and 2009 used a reserve pit.  The Court would be hard pressed to find that every developer drilling wells in North Dakota in 2008 and 2009, and using reserve pits rather than closed loop systems, acted in an unreasonable manner.  The Court finds, as a matter of law, that EOG's use of a reserve pit in 2008 and 2009, rather than a closed loop system, was not unreasonable.

However, the record is insufficient to determine whether EOG reclaimed and maintained the reserve pit in a reasonable manner.  It is undisputed that in June of 2009, a tear was discovered in the synthetic liner used in the reserve pit.  Nathaniel Erbele testified that he would not have required a liner in this particular reserve pit.  He explained, "The soil type is very clayey.  I would describe it as impermeable.  And I would not have been concerned about fluids moving through the soil." See Docket No. 47-5, p. 6.  Erbele also testified that EOG did everything it was required to do with regard to reclaiming the reserve pit.  Jason Hicks, field inspector for the North Dakota Industrial Commission, testified in a deposition that he would not have required a liner for EOG's reserve pit.  Hicks stated, "The soil at the location is, I would say, mostly clay, impermeable.  It would hold fluid so it would not required a liner." See Docket No. 47-4, p. 14.  Hicks further testified that EOG complied with all of the requirements to reclaim the reserve pit.

On July 9, 2010, Kris D. Roberts, Environmental Geologist for the North Dakota Department of Health, sent Frankie Kartch a letter explaining the test results for two samples of water Roberts took on June 1, 2010.  See Docket No. 47-7.  Roberts took samples from the wetlands immediately to the east and south of the well pad.  Roberts explained:

> Both water analyses indicated excellent water quality, with no signs of current petroleum or salt brine contamination.  Trace elements boron and barium are fairly typical, and very likely are derived from overland flow of the water. . . .
>
> The major ions calcium, magnesium, sodium, potassium, manganese, iron, chloride, sulfate, nitrogen, and ammonia are all well within the ranges associated with excellent surface water quality in that part of North Dakota during the spring season.

See Docket No. 47-7 (errors in original).  Frankie Kartch testified that he took a sample of well water from Section 8 and had it tested at the State Lab.  He reported that the results "did not appear to be outside of limits."  See Docket No. 13-1, p. 27.  Although the evidence currently before the Court indicates that nearby wetlands and groundwater have not been contaminated by the reserve pit, the Court declines to make a ruling at this early stage.  The dispositive motion deadline is May 1, 2012.  See Docket No. 45.  The parties should be allowed to conduct limited discovery to explore the effects of the reserve pit located on Section 17, the tear in the liner, and any potential adverse consequences related to the tear.

### B.   SCOPE OF DAMAGES UNDER SECTION 38-11.1-04

EOG contends that the damages available to the Kartches under N.D.C.C. § 38-11.1-04 are capped by the fair market value of the land directly affected by the well site.  EOG claims that its offer of $8,000 exceeds the fair market value of the directly affected land.  EOG also argues that damages awarded in an action under N.D.C.C. § 38-11.1-04 can only be paid in a one single lump

sum payment, and the surface owner can only elect annual payments when the parties negotiate an agreement as to damages.  The Kartches argue that damages under N.D.C.C. § 38-11.1-04 are not capped by the fair market value of the land; it is up to the fact finder to determine what land is directly affected by EOG's activities as well as the amount of damages; and they can elect annual damage payments.

> N.D.C.C. § 38-11.1-04 provides, in pertinent part:
>
> The mineral developer shall pay the surface owner a sum of money equal to the amount of damages sustained by the surface owner and the surface owner's tenant, if any, for loss of agricultural production and income, lost land value, lost use of and access to the surface owner's land, and lost value of improvements caused by drilling operations.  The amount of damages may be determined by any formula mutually agreeable between the surface owner and the mineral developer.  When determining damages, consideration must be given to the period of time during which the loss occurs and the surface owner may elect to be paid damages in annual installments over a period of time; except that the surface owner must be compensated for harm caused by exploration only by a single sum payment.  The payments contemplated by this section only cover land directly affected by drilling operations.  Payments under this section are intended to compensate the surface owner for damage and disruption.

N.D.C.C. § 38-11.1-04 (2005) (emphasis added).

The North Dakota Supreme Court has never addressed the proper scope of damages under N.D.C.C. § 38-11.1-04.  This statutory provision is poorly drafted and is, for all practical purposes, an invitation to further litigation.   EOG argues that the Court should apply North Dakota law regarding the doctrine of waste and find that damages are capped at the fair market value of the surface estate.  See Meyer v. Hansen, 373 N.W.2d 392, 397 (N.D. 1985) ("[D]epending on the facts of each case, either diminution in value or cost of repair is the appropriate measure of damages for waste").  The Court sees no reason to apply the doctrine of waste when the statutory language is clear.  "[L]ost land value" is only one of the categories of damages contemplated by N.D.C.C. § 38-

11.1-04.  A surface owner can also collect for "loss of agricultural production and income . . . lost use of and access to the surface owner's land, and lost value of improvements caused by drilling operations."  N.D.C.C. § 38-11.1-04 (2005).  If the North Dakota Legislative Assembly had sought to cap the compensable damages under N.D.C.C. § 38-11.1-04, it could have easily done so.  The Court finds, as a matter of law, that compensable damages under N.D.C.C. § 38-11.1-04 are not necessarily capped by the fair market value of the surface estate.

EOG also argues that the Kartches cannot elect annual installments.  EOG claims that a surface estate owner can only elect annual installment payments when the parties negotiate an agreement on damages.  The Kartches argue the statute allows for annual installment payments.  The statutory language is clear in that harm caused by exploration must be compensated in one single lump sum payment.  However, for all other damages the surface owner may elect to be paid in annual installments.  The statute does not differentiate between damages agreed-upon by the parties and damages awarded in a civil action.  The Court finds, as a matter of law, that any potential damages for harm caused by exploration must be made in a single sum payment, but any other potential damages may be paid in annual installments, at the Kartches' election.

## C.    NUISANCE

The Kartches allege that various activities in which EOG is engaged constitute a nuisance.  The second amended complaint states:

> Defendant's use of the surface estate has resulted in excessive noise and odors, contamination of soil and water, diminishment in air quality, excessive litter on [Plaintiffs'] property, and other such nuisances constituting an unreasonable use of the surface estate.  Defendant has also utilized the surface estate for activities unrelated to development of the mineral estate underlying Plaintiffs' surface estate, which are not reasonably necessary and for which Defendant must compensate

Plaintiffs.  Such activities include but are not limited to storage of unnecessary equipment on the surface estate.  The aforementioned unreasonable uses render Plaintiffs insecure in the use of their property and constitute nuisances pursuant to N.D.C.C. § 42-01-01.

See Docket No. 33, p. 6.  EOG contends the activities of which the Kartches complain are either allowed by rule or statute or do not rise to the level of a nuisance.

It is clear that mineral developers are responsible for damages "resulting from a nuisance caused by drilling operations."  N.D.C.C. § 38-11.1-06.  The North Dakota Century Code provides:

> A nuisance consists in unlawfully doing an act or omitting to perform a duty, which act or omission:
>
> 1.    Annoys, injures, or endangers the comfort, repose, health, or safety of others;
>
> 2.    Offends decency;
>
> 3.    Unlawfully interferes with, obstructs or tends to obstruct, or renders dangerous for passage, any lake, navigable river, bay, stream, canal, basin, public park, square, street, or highway; or
>
> 4.    In any way renders other persons insecure in life or in the use of property.

N.D.C.C. § 42-01-01.  The Court will consider the following alleged nuisances caused by EOG's drilling activities: 1) excessive noise; 2) contamination of soil and water; 3) diminished air quality, use of flare, and excessive odors; 4) excessive litter; and 5) storage of unnecessary equipment.

### 1)     **EXCESSIVE NOISE**

Frankie Kartch testified regarding noise on the property:

> I can hear that generator running in my home with the windows closed.  I can hear that generator running virtually – I can hear the generator running from every corner of any piece of property I own there.  It appears to run consistently.  It is very loud.  And it prevents enjoyment of my property.

. . . .

It disrupts my ability to sleep.  It disrupts my ability to recreate or enjoy or work on my property.  It constantly runs.

See Docket No. 13-1, p. 23.  Frankie Kartch testified that the noise had not physically injured himself, his family, or the land.  He also testified that in October 2009, Mountrail-Williams Electric Cooperative contacted him requesting an easement, which Kartch refused to grant.  EOG's counsel informed Kartch at the deposition that if the easement were granted, EOG would use a quieter electric generator.  Kartch indicated that he did not plan on granting the easement.  Kartch also suggested in an affidavit that noise from the generator can be mitigated by placing sandbags around the generator or placing a roof over the generator.  See Docket No. 76.

The North Dakota Supreme Court has defined "excessive" with regard to noise:

"Excessive" means "being too much or too great; immoderate; inordinate." Webster's New World Dictionary 488 (2d ed. 1980).  Another source defines "excessive" as "exceeding the usual, proper, or normal . . . very large, great, or numerous . . . greater than usual . . . describes whatever notably exceeds the reasonable, usual, proper, necessary, just, or endurable . . . ." Webster's Third New International Dictionary of the English Language Unabridged 792 (16th ed. 1971).

City of Belfield, N.D. v. Kilkenny, 2007 ND 44, ¶ 20, 729 N.W.2d 120.

EOG contends that regardless of whether the generator noise constitutes a nuisance, the Kartches cannot recover because they could have addressed the problem by granting an easement to Mountrail-Williams Electric Cooperative.  The North Dakota Supreme Court has explained:

A person injured by the wrongful acts of another has a duty to mitigate or minimize the damages and must "'protect himself if he can do so with reasonable exertion or at trifling expense, and can recover from the delinquent party only such damages as he could not, with reasonable effort, have avoided.'" Lochthowe v. C.F. Peterson Estate, 2005 ND 40, ¶ 21, 692 N.W.2d 120 (quoting Schneidt v. Absey Motors, Inc., 248 N.W.2d 792, 797 (N.D. 1976)).  The duty to mitigate damages is sometimes referred to as the doctrine of avoidable consequences.  See Forster v. West Dakota Veterinary Clinic, Inc., 2004 ND 207, ¶¶ 37-38, 689 N.W.2d 366.

21

Hanson v. Boeder, 2007 ND 20, ¶ 8, 727 N.W.2d 280.

While the Kartches complain that the noise produced by the generator is excessive and hinders their ability to enjoy the property, they do not claim that the noise is inordinate or exceeds the normal level of noise created by generators on active oil wells in North Dakota. A certain amount of noise is inevitable in oil production. There is no evidence in the record to indicate that the generator noise on the Kartches' property is excessive in this context. In addition, regardless of the measures EOG could take to reduce generator noise, the Kartches could have mitigated their damages by granting an easement to Mountrail-Williams Electric Cooperative. The Court finds, as a matter of law, that the generator noise on the Kartches' property does not constitute a nuisance under North Dakota law.

2)     <b>CONTAMINATION OF SOIL AND WATER</b>

As discussed above, the record is not sufficient for the Court to make a determination at this early stage regarding any potential contamination of the soil and water as a result of the reserve pit or the tear in the liner. The Fourth Circuit Court of Appeals has indicated that contamination of soil or water only constitutes a nuisance when the contaminants reach the level of a toxicological concern. See In re Wildwood Litig., 52 F.3d 499, 503 (4th Cir. 1995) (holding under South Carolina law that contaminants in water were not a nuisance because they did not rise to the level of a toxicological concern). Although the evidence currently reveals that the soil and water on the land at issue has not been contaminated, the Court will allow the parties to conduct limited discovery on this subject matter.

3)      **DIMINISHED AIR QUALITY, USE OF FLARE, AND EXCESSIVE ODORS**

Jim Schafer, EOG's Division Operations Manager for the Denver Division, explained EOG's use of a flare on its well in an affidavit:

> 7.      EOG has been flaring the gas produced at the Crowfoot 1-17H well site using a single flare.  EOG is flaring the gas because a gas gathering system does not exist in the area to market the gas.  Section 43-02-03-45 of the North Dakota Administrative Code specifically authorizes the flaring of gas produced at a well site pending arrangements for the disposition of the gas for some useful purpose.

> 8.      Flaring the gas produced at a well site when no gas gathering system exists is a common practice in the North Dakota oil and gas industry, both on lands where the surface owner additionally owns all or part of the mineral estate, and on lands where the surface owner does not own any of the mineral estate.  The flaring of gas at a well site until a gas gathering system exists for marketing the gas is a usual and customary practice in North Dakota.  There is nothing extraordinary about an oil and gas operator flaring the gas when a gas gathering system does not exist.

See Docket No. 49.  N.D.A.C. § 43-02-03-45 provides for the flaring of gas as follows:

> Pending arrangements for disposition for some useful purpose, all vented casinghead gas shall be burned.  Each flare shall be equipped with an automatic ignitor or a continuous burning pilot, unless waived by the director for good reason.  The estimated volume of gas used and flared shall be reported to the director on a gas production report (form 5b) on or before the fifth day of the second month succeeding that in which gas is produced.

N.D.A.C. § 43-02-03-45.

Frankie Kartch testified regarding his concerns with EOG's use of a flare.  He stated that he has concerns about volatile organic compounds ("VOCs"), hydrogen sulfide, effluents, and the smell he believes is coming from the flare.  He also complains about seeing the flare because it is "an unnatural part of the landscape."  See Docket No. 13-1, p. 22.  Kartch admitted that he has no evidence that VOCs, hydrogen sulfides, or effluents pose a risk to health or the environment, or that

they are injuring his use of the property.  Kartch testified that he cannot hunt or recreate near the flare because of the smell and the smoke it emits.

Section 42-01-12 of the North Dakota Century Code provides that "Nothing which is done or maintained under the express authority of a statute shall be deemed a nuisance."  EOG is required by N.D.A.C. § 43-02-03-45 to use a flare when gas cannot be put to a useful purpose.  The Kartches do not allege that EOG is operating its flare in violation of this regulation.  In addition, Frankie Kartch's stated concerns regarding VOCs, hydrogen sulfide, and effluents are speculative.  He admitted that neither the Plaintiffs nor their land has suffered any ill effects from the flare, other than the annoyances of the smell and sight of the flare.  It appears from the record that EOG is using a flare in a manner customary in the oil industry in North Dakota.  Therefore, the Court finds, as a matter of law, that the use of a flare on the land in question, and any alleged associated odors or emissions, does not constitute a nuisance under North Dakota law.

### 4)   **EXCESSIVE LITTER**

Frankie Kartch testified that there "is a significantly large amount of garbage that appears to be on [the well site] from time to time."  See Docket No. 13-1, p. 19.  He described it as "run-of-the-mill litter, garbage, blue plastic, gloves, rags, food wrappers, cans, plastic bottles."  See Docket No. 13-1, p. 19.  He also testified that he saw "significantly, other larger things that were laying around; wood, or, you know, cardboard or, you know, just other assorted – just junk."  See Docket No. 13-1, p. 19.  Excessive trash or garbage may constitute a nuisance.  See City of Minot, N.D. v. Freelander, 426 N.W.2d 556, 557 (N.D. 1988) (finding a house a nuisance partially because of "its insanitary condition due to an accumulation of garbage").  However, Kartch's testimony belies the

24

severity of the problems associated the litter at the well site.  He testified that the garbage on his property is "run-of-the-mill litter" and only appears in "significantly large amount[s] . . . from time to time."  See Docket No. 13-1, p. 19.  The litter of which the Kartches complain does not appear to be a persistent problem, nor does it cause the unsanitary conditions that rise to the level of a nuisance.  The Court finds, as a matter of law, that "run-of-the-mill litter" at the well site does not constitute a nuisance under North Dakota law.

### 5)  STORAGE OF UNNECESSARY EQUIPMENT

Frankie Kartch testified regarding equipment and vehicles that are stored at the well site:

Q.  Okay.  Are you complaining about trucks and traffic, or is that not something --

A.  Well, certainly, I am going to complain that EOG seems to use 17, Crowfoot 117, well 17780, as an occasional dumping ground for extra equipment, equipment exchange. [My tenant] has told me that in the past it appears that there has been lots of vehicles parked there.

. . .

Q.  You're complaining that EOG seems to be parking equipment – these are my words – you said dumping ground for extra equipment.  I'm going to say parking equipment –

A.  I think I said dumping grounds.  They park their vehicles there, but they also have stored storage tanks there that are not even hooked up and part of the well site.  I have seen other devices, stacks of something there.  I don't even know what it is.  Maybe perhaps it was used for something on the well.  I'm not even sure.  Again, I'm not a technical expert.

. . .

Q.  Okay.  And whatever they have parked or stored there, it's on the well site; correct?

A.  Yes.

See Docket No. 13-1, p. 19.

Kartch admits that he does not know what the equipment is used for, and acknowledges that it may be used for legitimate purposes.  The equipment is not being stored outside the area EOG is lawfully using for its oil production activities.  Kartch has not claimed any injury from the stored equipment other than his displeasure with its presence.  The Court finds, as a matter of law, that equipment occasionally stored at the well site does not constitute a nuisance under North Dakota law.

### D.   NOTICE

The Kartches argue that the notice EOG provided was not in compliance with N.D.C.C. § 38-11.1-05 because "it did not include a plat map or any notice that Defendant intended to construct a waste pit on Plaintiffs' surface estate."  See Docket No. 33.  The Kartches claim that the inadequate notice prevented them from meaningfully negotiating with EOG and demanding that EOG use a closed loop system rather than a reserve pit.

The version of N.D.C.C. § 38-11.1-05 in effect at the time EOG provided notice to the Kartches in 2008 states, in pertinent part:

> [T]he mineral developer shall give the surface owner written notice of the drilling operations contemplated at least twenty days prior to the commencement of the operations, unless waived by mutual agreement of both parties. . . . This notice must be given to the record surface owner at that person's address as shown by the records of the county recorder at the time the notice is given.  This notice must sufficiently disclose the plan of work and operations to enable the surface owner to evaluate the effect of drilling operations on the surface owner's use of the property.  Included with this notice must be a form prepared by the director of the oil and gas division advising the surface owner of the surface owner's rights and options under the chapter, including the right to request the state department of health to inspect and monitor the well site for the presence of hydrogen sulfide. If a mineral developer fails to give notice as provided under this section, the surface owner may seek any

26

appropriate relief in the court of proper jurisdiction and may receive punitive as well as actual damages.

N.D.C.C. § 38-11.1-05 (2005) (emphasis added).  In 2011, N.D.C.C. § 38-11.1-05 was repealed and

replaced with a new notice statute, N.D.C.C. § 38-11.1-04.1, which provides:

1.    Before the initial entry upon the land for activities that do not disturb the surface, including inspections, staking, surveys, measurements, and general evaluation of proposed routes and sites for oil and gas drilling operations, the mineral developer shall provide at least seven days' notice by registered mail or hand delivery to the surface owner unless waived by mutual agreement of both parties. The notice must include:

   a.    The name, address, telephone number, and, if available, the electronic mail address of the mineral developer or the mineral developer's designee;

   b.    An offer to discuss and agree to consider accommodating any proposed changes to the proposed plan of work and oil and gas operations before commencement of oil and gas operations; and

   c.    A sketch of the approximate location of the proposed drilling site.

2.    Except for exploration activities governed by chapter 38-08.1, the mineral developer shall give the surface owner written notice by registered mail or hand delivery of the oil and gas drilling operations contemplated at least twenty days before commencement of drilling operations unless mutually waived by agreement of both parties.  If the mineral developer plans to commence drilling operations within twenty days of the termination date of the mineral lease, the required notice under this section may be given at any time before commencement of drilling operations.  The notice must include:

   a.    Sufficient disclosure of the plan of work and operations to enable the surface owner to evaluate the effect of drilling operations on the surface owner's use of the property;

   b.    A plat map showing the location of the proposed well; and

   c.    A form prepared by the director of the oil and gas division advising the surface owner of the surface owner's rights and options under this chapter, including the right to request the state department of health to inspect and monitor the well site for the presence of hydrogen sulfide.

27

3.      The notice required by this section must be given to the surface owner at the
address shown by the records of the county treasurer's office at the time the
notice is given and is deemed to have been received seven days after mailing
by registered mail or immediately upon hand delivery.

4.      If a mineral developer fails to give notice as provided in this section, the
surface owner may seek appropriate relief in the court of proper jurisdiction
and may receive punitive as well as actual damages.

N.D.C.C. § 38-11.1-04.1.  The Court will apply the 2005 version of N.D.C.C. § 38-11.1-05 which

was in effect in August of 2008 when EOG first provided notice to the Kartches.

On August 25, 2008, Contex sent a notice to the Kartches stating:

Pursuant to Chapter 38-11.1 of the North Dakota Century Code, you are hereby
notified that EOG Resources, Inc. ("EOGR") of P.O. Box 4362, Houston, Texas
77210-4326, intends to commence or cause to be commenced the drilling of its
Crowfoot #1-17H Well at the following location:

Township 158 North, Range 89 West, 5th P.M.
Section 17: NW1/4NW1/4

The enclosed Access and Damage Settlement Agreement describes the amount of
land to be used for the Crowfoot #1-17H well and appurtenant facilities as well as
the compensation offered for such use.  EOGR estimates that drilling operations will
take from 40 to 45 days.  After rig release, facilities will be constructed and then
completion operations are commenced.  These activities typically take an additional
30 days depending on weather and equipment and personnel availability.  EOGR
respectfully requests your waiver of the required twenty (20) day notice of its intent
to drill so that it has the option of commencing well site construction before the
expiration of said twenty (20) day notice period.

See Docket No. 7-3.  The Access and Damage Settlement Agreement states that the drillsite and

access road will occupy approximately five acres.  See Docket No. 7-1.

Frankie Kartch testified regarding the allegedly inadequate notice provided by EOG:

A.      . . . EOG failed to tell me what they're going to do to my property.
I don't know what goes into drilling an oil well.  I do not know how many – I don't
know how it's going to be drilled.  I wasn't told how long it was going to be drilled

28

or, you know, I wasn't told the lateral that went underneath. I wasn't told a direction it was going to be drilled. I wasn't told how long they were going to be on my property drilling the well. I wasn't told what chemicals were used to frac it. I wasn't told the sound, the length of time, the traffic, the infrastructure that would be put on my property, the number of barrels, how many barrels would be stored there in those tanks.

I didn't know anything about saltwater as a byproduct of drilling a well and it's stored on my property in a tank. I wasn't told that there would be a flare there. I wasn't told if the flare would be covered. I wasn't told what kind of a wellhead would be put on there. I wasn't told there was going to be a pit. I wasn't told there would be buildings. I wasn't told there would be generators. I wasn't told there would be pipes running above the ground. And I wasn't told there would be pipes below the ground. I wasn't told anything.

Q.    Okay.

A.    Nor was I told how many acres they would take. They gave me an approximate.

Q.    What did they tell you approximate?

A.    Somewhere around five to six, if I recall.

Q.    Okay. So –

A.    It might have been less. Could have been less than five, too. I'm not entirely sure, but if I recall, I wasn't told an exact figure. That's my point. To me as a landowner, I should know exactly – before this is – before someone drills a well, I'm assuming that they have an exact plan for how many acres they're going to take and that I'm going to get a copy of it. I didn't get a layout of the – I didn't get a layout of even the proposed well site.

I wasn't told where the pit would be on the well site. I wasn't told that – you know, exactly where the road could come in. You could assume that that road came in off 71st Avenue, right, that would be a logical assumption, it's the only road going by. Well, the map I got later on differentiated – it still came from that road, but it deviated from the survey plat so I wasn't given anything.

Q.    Okay. So that's what you mean by failure to give notices, required notices?

A.    Correct.

See Docket No. 13-1, p. 30.

29

It appears from Frankie Kartch's testimony that he seeks information about EOG's drilling activities which he is not necessarily entitled to under North Dakota law.  N.D.C.C. § 38-11.1-05 requires that EOG provide the Kartches with enough information to allow them to "evaluate the effect of drilling operations on [their] use of the property."  The other information sought such as the number of barrels of oil stored on the well site, the storage of saltwater on the well site, the pipes running above and below ground, and buildings that would be built on the well site, was not required to be disclosed to the surface owner in 2008 as part of the statutory notice required under North Dakota law.  Nor can the surface estate owner expect developers to provide an exact figure as to the acreage to be occupied or the length of time drilling operations will take.  EOG provided reasonable estimates to the Kartches that it would occupy approximately five acres and drilling and completion operations would take approximately 70-75 days.  See Docket Nos. 7-1 and 7-3.

The Kartches allege in their complaint that more notice from EOG would have allowed them to meaningfully negotiate and demand that EOG use a closed loop system rather than a reserve pit. This is not a right which was afforded to surface estate owners in 2008 or 2009.  The Eighth Circuit Court of Appeals has explained:

> Although North Dakota law protects the surface owner's property rights by limiting the mineral holder to the "reasonable use" of the surface, North Dakota law does not, and could not, cloak the [surface owner] with the specific authority to approve surface use plans.  Indeed, there is not even specific authority to allow a surface owner to enjoin the unreasonable use of the surface.  Hunt Oil does not discuss injunctive relief.  North Dakota's Oil and Gas Production Compensation Act requires only that the mineral developer "give the surface owner written notice of the drilling operations contemplated at least twenty days prior to the commencement of the operations," and provides a damages remedy.  N.D. Cent. Code § 38-11.1-05 (1987).

Duncan Energy Co. V. U.S. Forest Serv., 50 F.3d 584, 588 (8th Cir. 1995).  It is clear that in 2008 the law did not require EOG to negotiate with the Kartches regarding the use of a reserve pit, nor

does the law provide the surface owner (the Kartches) the right to make specific demands as to how EOG uses the surface estate.

The statutory notice which EOG was required to provide in 2008 must be sufficient to allow the Kartches to evaluate the effect of EOG's activities on their use of the property. The Court finds that there are no genuine issues of material fact as to the notice that was provided by EOG. The Court finds, as a matter of law, that the statutory notice provided by EOG to the Kartches in August 2008 was sufficient and in compliance with N.D.C.C. § 38-11.1-05 (2005).

### E.      TRESPASS

The Kartches also allege in their complaint that EOG's refusal to remove the liner and waste contained in the reserve pit constitutes a trespass, and the land and soil are currently being contaminated, causing unnecessary damage to the Kartches' surface estate. As discussed above, the Court will allow the parties to conduct limited discovery regarding the effects of the reserve pit, the tear in the liner, and any potential resulting contamination. Nevertheless, the Court finds, as a matter of law, that the burying of waste and the use of a synthetic liner in a reserve pit does not constitute a trespass under North Dakota law. The use of a reserve pit is allowed by the North Dakota Industrial Commission's rules and regulations, and the use of a synthetic liner is a normal, customary, and reasonable practice in the industry.

IV.    **CONCLUSION**

The Court has carefully considered the entire record, the parties' briefs, and relevant case law. The Court **GRANTS IN PART** and **DENIES IN PART** the Defendant's motion for summary judgment (Docket No. 46) and rules as follows:

- The Court finds, as a matter of law, that the use of a reserve pit in 2008 and 2009 rather than a closed loop system is not an unreasonable practice in North Dakota.

- The Court will allow the parties to conduct limited discovery regarding any potential contamination of the soil or water which may have resulted from the reserve pit or the tear in the synthetic liner.

- The Court finds, as a matter of law, that any potential damages are not necessarily capped by the fair market value of the surface estate, and the Plaintiffs may elect to be paid in annual installments.

- The Court finds, as a matter of law, that generator noise, the use of a flare, "run-of-the-mill" litter, and the storage of equipment, based upon the undisputed facts in this particular case, does not constitute a nuisance under North Dakota law.

- The Court finds that any potential contamination of the soil and water on the land at issue may constitute a nuisance.

- The Court finds, as a matter of law, that the statutory notice the Defendant provided to the Plaintiffs in August 2008 was sufficient and in compliance with Section 38-11.1-05 (2005) of the North Dakota Century Code.

• The Court finds, as a matter of law, that burying waste and using a synthetic liner in the reserve pit, based upon the undisputed facts in this particular case, does not constitute a trespass under North Dakota law.

The Plaintiffs' third and fourth causes of action are dismissed. The Magistrate Judge will issue an order addressing the Plaintiffs' motion to compel discovery (Docket No. 58) and establishing new discovery deadlines based on the limited discovery to be allowed. The Court will entertain further dispositive motions after the additional discovery has been completed. In addition, the parties shall take part in an early settlement conference to be coordinated with Magistrate Judge Charles S. Miller, Jr. and which shall take place before further discovery is undertaken. Judge Miller's office will be contacting the parties within the near future to schedule the settlement conference.

**IT IS SO ORDERED**.

Dated this 29th day of February, 2012.

*/s/  Daniel L. Hovland*
Daniel L. Hovland, District Judge
United States District Court

33